THE PEOPLE *ex rel.* JOHN C. WATSON, Director, Department of Registration and Education, Plaintiff-Appellant, *v.* HOUSE OF VISION, Defendant-Appellee.

(No. 57038;

First District (5th Division)—November 21, 1973.

*Rehearing denied January 4, 1974.*

William J. Scott, Attorney General, of Chicago (Warren K. Smoot and Donald S. Carnow, Assistant Attorneys General, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Max E. Wildman, Lawrence J. West, Rupert J. Groh, and James P. Dorr, of counsel), for appellee.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal from a judgment in favor of defendant at the close of the plaintiff's case. The action was brought on the relation of the Director of the Department of Registration and Education pursuant to section 24 of the Illinois Optometric Practice Act (hereinafter Act) (Ill.

Rev. Stat. 1966, ch. 91, par. 105.24), alleging in substance, that defendant was violating the strictures of the Act by the unlawful practice of optometry, insofar as it engaged in the practice of contact lens fitting. To that end, plaintiff sought "to enjoin any such person, firm or corporation from practicing optometry or from such act or acts in violation of the provisions of this act." [1]

Plaintiff, in its complaint, asserted that defendant's conduct, in the fitting of contact lenses, was within the purview of the Act[2]. Specifically, it was charged that defendant, by its unlicensed employees, fitted contact lenses to, among others, an investigator of the Department of Registration and Education who gave to defendant a prescription for lenses from an optometrist, and that such fitting involved the exercise of professional skill and judgment as contemplated by the Act. An amended complaint alleged the same basis for injunctive relief and, further asserted that the acts of defendant were encompassed by the wording of the Act: *viz;* it engaged in the measuring of the powers of vision; it fitted contact lenses for the purpose of adapting contact lenses for the eye; and did the above without the direct supervision of a licensed optometrist. Moreover, the amended complaint also alleged defendant exercised professional judgment, both subjective and objective, in making a number of physical de-

---

[1] Ill. Rev. Stat. 1966, ch. 91, § 105.24.

[2] Ill. Rev. Stat. 1966, ch. 91, § 105.3:

"The practice of optometry is defined to be the employment of objective or subjective means, or both, for the examination of the human eye and its appendages, without the use of drugs, medicine, or surgery, for the purpose of ascertaining any departure from the normal, measuring its powers of vision, and adapting lenses or prisms, ocular exercises, visual training, or any other method other than the use of drugs, medicine, or surgery, for the aid thereof. A person shall be deemed to be practicing optometry within the meaning of this Act who in any way advertises himself to be an optometrist, or who shall employ any means for the measurement of the powers of vision or the adaptation of lenses or prisms for the aid thereof, or who shall practice or offer or attempt to practice optometry, as herein defined, either on his own behalf or as the employee of a person, film, or corporation, whether under the supervision of his employer or not, or who shall use testing appliances for the purpose of measurement of the powers of vision or diagnose any ocular deficiency or deformity, visual or muscular anomaly of the human eye or prescribe lenses, prisms, or ocular exercise for the correction or relief thereof, or who holds himself out as qualified to practice optometry. Nothing in this section shall be interpreted to prevent a person from acting as an assistant under the direct supervision of a person licensed by the State of Illinois to practice optometry or medicine and surgery, or to prohibit visual screening programs conducted by charitable organizations acting in the public welfare under the supervision of a committee composed of persons licensed by the State of Illinois to practice optometry and persons licensed by the State of Illinois to practice medicine and surgery."

terminations in regard to the contact lenses.[3] Defendant admitted fitting the contact lenses but denied that its conduct in this regard was within the contemplation of the Act or in contravention thereof. Rather, defendant answered, it performed the mechanical function of fitting contact lenses by trained personnel consistent with and only after a prescription of an optometrist or ophthalmologist for lenses is given to defendant by the customer.

Plaintiff, in its case in chief, called three witnesses: John Webster and Joseph Gulino, employees of defendant, who testified to the procedures undertaken by defendant in the fitting process, and Dr. Kenneth Polse, an Alabama optometrist, testified, as an expert witness for the State, to the optometric implications of the contact lens fitting process. From their testimony, plaintiff argues that defendant's conduct fell within the ambit of the Act and, therefore, constituted the practice of optometry without a certificate of registration (Ill. Rev. Stat. 1966, ch. 91, par. 105.1).

On appeal plaintiff contends that the testimony was sufficient to establish a prima facie case of statutory violation, and that the motion for judgment at the end of its case should have been denied. Defendant, conversely, seeks an affirmance of the trial court's ruling, which found:

> "That the acts and things done by defendant in the fitting of contact lenses does not constitute the practice of optometry as defined in Section 3 of the Illinois Optometric Practice Act * * *."

Without engaging in a lengthy recital of defendant's procedures, we note from the testimony that the following transactional setting occurs in the fitting process. Initially, a keratometer [4] reading is taken of the customer's eye and trial lenses are inserted in accordance with fitting charts utilized by defendant. After insertion of the lenses, the fitter uses

---

[3] "(a) Determined the base curve or the inside central curvature of contact lenses * * *.

   (b) Determined the peripheral curve radius of the contact lenses * * *.

   (c) Determined the peripheral curve width of the contact lenses * * *.

   (d) Determined the optical zone width or the diameter of the central optical zone of the contact lenses * * *.

   (e) Determined the refractive power of the contact lenses * * *.

   (f) Determined the central thickness of the contact lenses * * *.

   (g) Determined the edge thickness and edge design of the contact lenses * * *.

   (h) Determined the total diameter of the contact lenses * * *."

[4] An instrument used to measure the curvature of a sphere. Herein, used for measuring the curvature of the anterior surface of the cornea. Grosvenor, Contact Lens Theory and Practice (The Professional Press, Inc., 1963).

fluorescein [5] and a Burton Lamp [6] to evaluate tear circulation behind the lens. After this procedure, the fitter writes an order necessary for fabrication of the lenses. In regard to initial visitations (not defendant's specifically), plaintiff's expert testified that a keratometer reading was incapable of measuring an irregular cornea [7] and that the optician decides whether the signs he views are regular or irregular. Moreover, the expert also testified that fluorescein patterns are subject to misinterpretation and, although charts are available, the various lens curves determined by the fitter's judgment may not be accurate.

Secondly, upon delivery of the finished lenses, the customer is instructed on how to insert them, and is once again viewed with fluorescein and the Burton Lamp to determine fit. Based on this, necessary adjustments of the lenses are made and the customer is then given a wearing schedule. Polse testified that the power of the finished lens may not be accurate and in order to obtain the proper ultimate power, a refraction through a trial lens should be performed. There is no testimony that any refraction is done by defendant.

Thirdly, successive check-up visits are followed, whereby the fitter may determine lens fit, as well as elicit customer complaints, in order to compensate for improper lens design or shape. In addition, the fitter checks for staining [8] or other corneal changes [9] and takes additional keratometer readings. Based upon the above, the fitter determines whether any adjustments are necessary. Succeeding visits engender the same purpose. Polse testified that the purpose of the follow-up visits during the "adaptive period" are to evaluate the effect the lens has on the cornea. In addition, he testified that through customer response, the

---

[5] A chemical dye which stains the tear fluid when instilled in the eye and the pattern observed with black light or the slit lamp of the biomicroscope, * * * the fluorescein glows as the radiation excites it and that the brillance is proportional to the depth of the retro-lens tear layer in which the fluorescein is dissolved. The fitter then interprets what he sees according to his skill and knowledge * ** *. Lester, Robert, The Fluorogram, 46 Am. J. of Optometry, 221 (1969).

[6] A specialized lamp containing a magnifier, having both white and ultraviolet light tubes which enables the fitter to examine the eye, the tear layer, tear flow, lens movement, and how the lens is positioning under magnification.

[7] e.g., where person has had a cataract operation; is suffering from keratoconus or irregular astigmatism.

[8] When epithelial tissue is either altered or actually destroyed, causing voids in the epithelium.

[9] Edema (swelling caused by an increase of water in the cornea); Scarring (alteration in normal composition of the epithelial tissue occurring when the epithelial cells are subject to prolonged irritation causing scar tissue to form).

fitter can make judgments as to possible causes of the responsive symptoms.

Inasmuch as plaintiff has attempted to categorize defendant's acts as those expressly delineated by the Act, it is necessary to set out the relevant arguments and the purportedly controlling statutory language.

## I

Plaintiff initially contends that defendant "adapts" lenses within the meaning of the Act.[10] It asserts:

> "[A]s a result of his examination and observation, the technician in the exercise of his judgment determines whether to modify the lenses and the extent to which modifications and adjustments should be made. In other words, the technician *adapts* the lenses better to conform to the customer's eye and to preserve normal metabolic process." (Emphasis added.)

In support of this proposition, the State relies heavily on *State ex inf. Danforth v. Dale Curteman, Inc.* (Mo. 1972), 480 S.W.2d 848, wherein the court found defendant's admission of "fitting" lenses to be synonymous with "adaption", within the meaning of the Missouri Act.[11] In *Curteman*, the court stated at page 856:

> "It is equally plain that Curteman engaged and engages in '[t]he * * * adaptation * * * of lenses * * * to correct defects or abnormal conditions of the human eye.' To 'adapt' means 'to make suitable or fit (as for a particular use, purpose, or situation) * * * to make suitable (for a new or

---

[10] Ill. Rev. Stat. 1966, ch. 91, § 105.3:

"The practice of optometry is defined to be the employment of objective or subjective means, or both, for the examination of the human eye and its appendages, without the use of drugs, medicine, or surgery, for the purpose of ascertaining any departure from the normal, measuring its powers of vision, and adapting lenses or prisms, ocular exercises, visual training, or any other method other than the use of drugs, medicine, or surgery, for the aid thereof."

[11] Missouri—V.A.M.S. § 336.010: Defining practice of optometry.

"Any one of any combination of the following practices constitutes the practice of optometry:

(1) The examination of the human eye, without the use of drugs, medicines or surgery, to ascertain the presence of defects or abnormal conditions which can be corrected by the use of lenses, prisms or ocular exercises.

(2) The employment of objective or subjective mechanical means to determine the accommodative or refractive states of the human eye or the range of power of vision of the human eye.

(3) The prescription or adaptation without the use of drugs, medicines or surgery, of lenses, prisms, or ocular exercises to correct defects or abnormal conditions of the human eye or to adjust the human eye to the conditions of special occupation * * *."

different use or situation) by means of changes or modifications.' Webster's New International Dictionary, Third Edition. 'Adaptation' is 'the act or process of adapting, fitting or modifying' or 'adjustment to environmental conditions.' Idem. *Adaptation is synonymous with fitting.* The adaptation of contact lenses by one prescribing such lenses is the activity or process by which such lenses are fitted to the eyes of the individual. It includes all of the actions taken by Curteman in measuring and examining the eye of the patient, the insertion of the fluorescein dye, the placing of the lenses on the cornea, the giving of a wearing schedule, the examination of the patient and the eye after trial use of the lenses, and the making of any necessary modifications in the lenses to insure a proper fit. Curteman makes contact lenses suitable to patients; fits and adjust them to the human eye; alters, changes the form and structure and modifies contact lenses to fit the needs of the patient. Dale Curteman conceded that his corporation is engaged in adapting contact lenses, in the following exchange: 'Q And would you state what business Dale Curteman, Inc. is engaged in? A The fitting, upon medical referral from medical doctors, of contact lens, artificial eyes and prosthetic appliances.' Under Dale Curteman's own admission and under the plain and unambiguous language of the subsection Curteman is engaged in the adaptation of contact lenses to correct defects or abnormal conditions of the human eye.

As we construe Chapter 336 and its several provisions the circuit court erred in concluding as a matter of law that the activities and practices of Curteman do not constitute the practice of optometry in violation of Chapter 336."

Defendant, conversely, argues that the proper interpretation of the word "adapt" is to be found in *State ex rel. Londerholm v. Doolin,* 497 P.2d 138, 151 (Ka. 1972)[12]:

---

[12] Kansas—K.S.A. 65—1501 [L.1923, ch. 220, § 1.]
"Practice of optometry defined.

The practice of optometry is defined as follows: The examination of the human eye without the use of drugs, medicines or surgery, to ascertain the presence of defects or abnormal conditions which can be corrected by the use of lenses, prisms, or ocular exercises and their adaption for the aid thereof."

Kansas—K.S.A. 65—1502 [L.1923, ch. 220, § 2.]
"Who deemed practitioners.

That any person shall be deemed to be practicing optometry within the meaning of this act, * * * who shall make in any manner a test or examination of the eye or eyes of another to ascertain the refractive muscular or pathological condition thereof; *third,* who shall in any manner adapt lenses to the human eye for any purpose, either directly or indirectly."

"Finally, plaintiffs contend that the defendants in the fitting process are 'adapting' lenses to the human eye. Plaintiffs argue that the three criteria of a good fit are: (1) That lenses provide good vision, (2) that they fit comfortably, and (3) that they cause no damage, and that defendants resolve at least two of the three. Defendants strive to provide lenses that fit comfortably and cause no damage. In one sense, this could be construed to mean 'adaptation' as used in the statute. The statute, however, is aimed at correcting 'defects or abnormal conditions' by use of lenses. The use of the word 'adaptation' must be construed in connection with the intent of the statute. In this light, 'adaptation' does not refer to the fitting process, but to the correction of refractive errors caused by 'defects or abnormal conditions.' These are the responsibility of the physician. The defendants do not 'adapt' the lenses by determining that certain optical qualities are needed to correct refractive error."

■■ Moreover, defendant maintains that when the relevant portions of the Act are read in their entirety, the reference made by "adapt" is to a judgmental determination of the optometrist for a method or means of correcting a previously diagnosed condition. We believe the word "adapt" must be construed in the context in which it appears in the Act and this is true even though the statutory definition of optometry is, to some extent, to be read in the disjunctive. It is our belief that a plain reading of the Act indicates that, after an examination for the purpose of ascertaining any departure from normal or measuring the powers of vision, the optometrist may recommend the adaption of lenses * * * or any other method, *for the aid thereof* (if a departure from normal is found or a relief for the power of vision is needed). Plaintiff stated in its brief:

"While it is true that the eye doctor presumably conducts an examination and a refraction before writing the spectacle prescription delivered to defendant's fitters and has also presumably made a professional judgment that the patient is a suitable candidate for contact lenses, that is the extent of the eye doctor's involvement in the contact lens process."

We do not believe that the record establishes that defendant performs this function of recommending the adaption of lenses for the aid of any departure from normal found by defendant, rather, it appears that defendant is the conduit through which the necessary "aid" is rendered. To that end, the construction of "adaption" by the court in *Doolin* is more persuasive, although our determination herein is predicated upon our own understanding of the Act, as implemented by the evidence or lack

thereof in the record. Accordingly, and consistent with the record, we cannot say that defendant "adapts" lenses as contemplated by the Act. Consistent with our understanding of the word "adapt", in its textual setting, is the Illinois Supreme Court's discussion in *People v. Griffith,* 280 Ill. 18, 23, 117 N.E. 195:

> "* * * to practice the calling or profession of examining the eye to ascertain if there are defects *which can be remedied by the use of lenses,* the determination of the accomodative and refractive states of the eye, the range and power of vision and abnormal conditions and the *adaption of lenses to correct defects* * * *." (Emphasis added.)

## II

■ ■ Secondly, plaintiff contends defendant, in the course of the fitting process, "measures powers of vision" by the use of objective and subjective examinations.[13] Plaintiff contends the following conduct constitutes a violation of the Act.

> "During the initial visit, before the fitter can decide whether to specify a special contact lens, such as a toric, bi-toric or lenticular lens, the technician must make objective examinations of the eye to determine whether the customer has corneal irregularities such as those found in persons having high corneal toricity or astigmatism or, in those persons who have had cataract surgery. In order to make this determination, the technician must evaluate the customer's vision as it is affected by the irregular condition and the contact lens' ultimate effect upon that condition. In other words, the technician must make a decision with respect to the customer's *powers of vision* from his observations and examinations and then exercise his judgment to select the appropriate special lens to correct the condition he observed."

Further, plaintiff argues that on successive visits the fitter deals with the customer's "visual problems" and makes both qualitative and quantitative measurements in the course thereof: "[A] change in corneal curvature or the presence of edema directly affects *powers of vision* and visual acuity." Plaintiff cites no case and introduced no medical testimony from which it could be determined that defendant's acts constitute the measurement of the powers of vision. Further, it appears that plaintiff avoids any discussion of the optometric function (refraction) as it applies to the aforementioned measurement, a function which is undertaken by the

---

[13] Ill. Rev. Stat. 1966, ch. 91, § 105.3, see Footnote 10.

optometrist or ophthalmologist prior to the issuance of a corrective prescription and a function, in its totality, which, from the record, appears to be unconnected to defendant's conduct. As stated in *Doolin,* at page 151:

> "Refraction is solely determined by the physician in the prescription delivered to defendants. The prescription used by the defendants in ordering contact lenses does not determine refractive error in the eyes except as determined by physicians and as modified by the use of charts and formulae approved by the physicians for use by defendants."

Plaintiff, we feel, incorrectly construes "the evaluation of the customer's vision" or "visual problems" to be the measuring of the powers of vision. The former, perhaps the result of improper lens fit, should not be confused with a determination of whether lenses are actually needed. The use of the keratometer to determine the presence or absence of corneal distortion and edema, was explained in *High v. Ridgeway's Opticians,* (N.C. 1963), 129 S.E.2d 301, 304:

> "A keratometer (or ophthalmometer) is a mechanical instrument or device used for measuring the curvature of the cornea of the human eye. As we interpret the evidence its use has no relation whatever to the methods used by medical doctors, oculists or optometrists in the measuring of the powers of vision. There is no evidence on the record tending to show that there is any other instrument, device, or method in general use that is better adapted for the purpose of obtaining the curvature of the cornea of the human eye, which information is necessary to properly fabricate a contact lens for the eye."

Finally, plaintiff's witness, Webster, testified that to the best of his knowledge defendant did not test visual acuity, vision, refract or make any determination of what the prescription should be.

(Up to this point we must note, parenthetically, that this court would be better advised as to the medical significance of defendant's acts if the plaintiff, in its case in chief, had introduced expert witnesses competent to answer hypothetical questions in this regard. Polse, being an Alabama optometrist, was found by the trial court to be incompetent to answer certain questions, hypothetical in nature, put to him at the conclusion of his testimony, and the void left in the record by this testimony, weakens the position taken here by the plaintiff.)

## III

Plaintiff next contends that defendant practices optometry because it

prescribes lenses for the correction or relief of the human eye.[14] Specifically, it states:

"The spectacle prescription received by Defendant does not describe or define any of the essential ingredients of a contact lens prescription. Defendant must supply every element but one of the specifications in order to enable a manufacturer to fabricate the lenses. Only the power of the spectacle lenses is provided by the eye doctor, but even that is changed by the technician. The power of the contact lenses are not normally the same as the power of the spectacle lenses because the power of the contact lenses is dependent on the base curves selected by the technician."

In support of its contention, plaintiff cites approvingly from *Curteman*, at pages 854, 855:

"I. 'Prescription' of lenses

That Curteman engaged and engages in '[t]he prescription * * * of lenses * * * to correct defects and abnormal conditions of the human eye' is clear under all accepted definitions of the term 'prescription'. To 'prescribe' means 'to write or give medical prescriptions (for a patient) * * * to give advise in the manner of a doctor giving a medical prescription * * * to lay down authoritatively as a guide, direction, or rule of action: impose as a peremptory order: dictate, direct, ordain * * * to direct, designate, or order the use of as a remedy (the doctor *prescribed* quinine).' Webster's New International Dictionary, Third Edition. A prescription for a contact lens is a written direction for the preparation of such a lens to be fabricated in conformance with certain specifications calculated to meet the refractive needs of the human eye, and includes both the device and the instructions given by the prescriber as to the use of the device. Without doubt the form which Curteman prepares, issues and presents to the laboratory for fabrication of contact lenses is a *prescription* within the wording of subsection (3). One basic factor contained in the prescription (the correction of the refractive error) is derived from a prescription issued by an ophthalmologist, but it is not possible to fabricate a contact lens from a prescription for ordinary spectacles. Ten other additional opera-

---

[14] Ill. Rev. Stat. 1966, ch. 91, § 105.3:

"* * * who shall use testing appliances for the purpose of measurement of the powers of vision or diagnose any ocular deficiency or deformity, visual or muscular anomaly of the human eye or *prescribe* lenses, prisms, or ocular exercise for the correction or relief thereof, * * *."

tions, measurements, judgments and decisions must necessarily be made by someone before the 'converted' prescription may be issued in form sufficient to enable a laboratory worker to fabricate the lens. Curteman performs these ten additional necessary operations, measurements, etc., determines and prescribes the final specifications, and issues the prescription used by the fabricator. Thereafter Curteman instructs the patient as to the use of the devices. Under the wording of subsection (3) as written, the only reasonable and realistic conclusion is that Curteman is engaging in the prescription of lenses to correct defects or abnormal conditions of the human eye.

It does not militate against this conclusion that one ingredient of the final prescription comes from a physician or that after Curteman performs these services to the best of Curteman's ability the result is subject to review and approval or disapproval by the physician, who inspects the lenses and re-examines the eyes of the patient. 'It is no defense that Reiss processed a doctor's prescription and that his work had been pronounced satisfactory by the ophthalmologist after a wearing time of three weeks. The crucial period requiring professional supervision was at the time of the adaptation of the lenses, their initial adjustments and the early stages of wearing.' New Jersey State Board of Optometrists v. Reiss (1963), 83 N.J. Super. 47, 198 A.2d 816, 1, c. 822. 'Appellant's contention that he would have referred the patient back to the prescribing doctor does not excuse his practice of optometry at the time of fitting.' Fields v. District of Columbia (1967), D.C. Ct.App., 232 A.2d 300, 1, c. 306."

■■ We believe that the use of the word "prescribe" in the Act is to be denominated as the end result of the diagnostic function, performed by the optometrist or ophthalmologist. Defendant's conduct, in our view of the Act, is merely an implementation of the original prescription which resulted from a determination that, among other things, an ocular deficiency, deformity, visual or muscular anomaly existed. As defendant aptly points out, the prescribing eye doctor expects performance by the party to whom the prescription is taken and, in the case herein, defendant is obtaining physical specifications for lenses pursuant to the doctor's direction to do so. As hereinbefore noted in *Doolin:*

"The prescription used by defendants in ordering contact lenses does not determine refractive error in the eyes except as determined by physicians and as modified by the use of charts and formulae approved by the physicians for use by the defendants."

■■ The order for the fabrication of the lenses, which includes the additional parameters [15] determined by defendant, we believe, from the evidence offered here, is not the type of "prescription" contemplated by the Act. It is our view that one must first undertake to diagnose some deficiency for which a correction is necessary. To take, as plaintiff does, the form used by defendant in the regular course of its business (designated "retail Rx blank") and argue that "Rx" is the medical abbreviation of the word "prescription", and therefore defendant prescribes lenses, strains a reasonable interpretation of the Act.

## IV

Next, plaintiff contends that defendant examines, subjectively and objectively, the human eye for the purpose of determining departures from normal.[16] Defendant purportedly does the above when it determines the shape of the cornea by keratometer readings; in the decision whether to order special lenses; and by the elicitation of customer responses as to the comfort of lens fit. These "examinations", plaintiff asserts, are best exemplified. when the fitter undertakes the examination of the eye to determine the presence of corneal staining, stippling, edema, and deformity in corneal curvature. To this point the court in *Doolin*, at page 151, responded:

"Plaintiffs contend the defendants examine eyes for pathological conditions. This argument is based upon the use of the fluorescein pattern test. Although this test may result in disclosing pathological conditions of the eye, such as stippling, dimpling, or abrasion, the basic purpose of the test is to determine the fit, particularly, whether or not the contact lens is floating on the cornea or is

---

[15] (a) The base curve (the central curve on the back surface of the contact lens).
(b) The optical zone diameter (part of the back surface of the lens over which the base curve maintains a constant curvature).
(c) The diameter of the contact lens.
(d) The secondary curve (the curve immediately adjacent to the base curve on the back surface of the lens).
(e) The peripheral curve (the outer curve of the lens immediately adjacent to the secondary curve).
(f) Central thickness (the distance between the front and back surfaces of the lens measured at its center).
(g) The power of the contact lens (a function of the thickness and the front and back surfaces of the lens).
(h) The transition zones or blends (treatment to these areas between the base and secondary curves).
(i) The edge treatment (the shape thickness and contour of the edge of the contact lens).

[16] Ill. Rev. Stat. 1966, ch. 91, § 105.3; See Footnote 10.

touching the cornea. If, in the process of testing the fit by the use of this test, abnormal conditions are discovered, the patient is directed back to his physician. The pathological conditions are the responsibility of the physician, not the defendants.

We believe the record lacks sufficient evidence to establish that defendant attempted to examine the human eye within the meaning of the Act. Moreover, it appears to us that the function of determining "departures from normal" is not, in light of the Act's wording, to be viewed as standing alone. The conjunction "and" (defined as "also", "in addition", "moreover", "as well as") which follows "departures from normal" indicates that once the examination is performed any necessary corrective or prescriptive action is then undertaken. Examination by the optometrist, in this context, is either for the purpose of acting upon the observation made or, if the optometrist is precluded from acting, referring the client to one who can. Should the observed "departure" be correctable by lenses, prisms, ocular exercises, visual training or other methods, the necessary prescription is made. If, on the other hand, the "departure" examination requires the use of drugs, medicine or surgery, the optometrist is proscribed from acting. It is clear to us that the above is not within the realm of defendant's operations. Defendant, necessarily, may view any departure from normal when it observes the relationship of the lens and the cornea. However, as we construe the Act, this is not the type of conduct contemplated as being within the practice of optometry. It appears to us that the "examinations" by defendant were not made for the purpose of ascertaining proper lens fit. The Act indicates the examination must be for one of two purposes; determining departures from normal and measuring powers of vision, neither of which defendant is engaged in.

Plaintiff asserts that there are differences in the Act herein and the statutory authority relied upon by the court in *Doolin:* in particular, the "referral section" of the statute, K.S.A. 65-2872 [L. 1957, ch. 343, § 72], which is as follows:

"The practice of the healing arts shall not be construed to include the following classes or persons.

＊　＊　＊

(g) Persons whose professional services are performed under the supervision or by order of or referral from a practitioner who is licensed under this act."

However, the basis for the court's decision in *Doolin* was predicated upon a finding, as a matter of law, that the acts of defendant did "not result in determining refractive error, or in examining eyes for pathological conditions, or in adapting lenses within the meaning of the Statutes

of this state." Further, we find the *Doolin* decision persuasive only to the extent that it provides, as hereinbefore noted, more reasonable interpretations of comparable statutory language.

■■ A later section of the Act seemingly particularizes the general language of the above "departure from normal" as follows:

> "A person shall be deemed to be practicing optometry within the meaning of this Act * * * who shall * * * diagnose any ocular deficiency or deformity, visual or muscular anomaly of the human eye * * *."[17]

Plaintiff argues defendant engages in such conduct, while defendant contends that in ascertaining lens fit they may view certain corneal changes manifested as a result of improper fit. However, they undertake no diagnostic function. We conclude that this portion of the Act is a clarification and enumeration of "ascertaining any departure from normal" insofar as the specified pathological conditions mentioned constitute such departures. While specific statutory provisions are to control general provisions on the same subject (*People ex rel. Oller v. Cairo & Thebes R.R. Co.*, 364 Ill. 329, 333, 4 N.E.2d 482), it appears that construction of the above portions of the Act should be governed by consistent interpretations. Therefore, the reasoning applied in our discussion of "departure from normal" applies with equal certaintude in this instance. Further, the above quoted passage is itself followed by:

> "*[O]r* prescribe lenses, prisms, or ocular exercise for the correction or relief thereof." (Emphasis added.)

We note for purposes of consistency, that the conjunction "or" should in fact be "and." As hereinbefore discussed, the import of the Act is to preclude the examination of the human eye for the purpose of ascertaining any departure from normal (diagnosing ocular deficiencies, etc.) and adapting (prescribing) lenses, etc. for the aid thereof. We are of the opinion that the use of the clause "for the correction and relief thereof" is significant and, if read as part of the disjunctive clause beginning with "or prescribe lenses, etc.", the necessary reference would have to go back to the "measuring of the powers of vision" and the "diagnosis of ocular deficiencies", etc. The use of "or" and "and" is so frequently inaccurate in statutory enactments that courts readily change "or" to "and" and vice versa, whenever such conversion is required by context. (*Goldblatt v. City of Chicago*, 30 Ill.App.2d 211, 217, 174 N.E.2d 222.) Moreover, the Act initially defines what acts, generally, constitute the practice of optometry ("The practice of optometry is * * *"); thereafter, the Act proscribes certain conduct, if engaged in, as within the broad defini-

---

[17] Ill. Rev. Stat. 1966, ch. 91, § 105.3.

tional structure of the practice of optometry. Clearly, the definitional aspect and the proscriptive aspects are not mutually exclusive. Accordingly, we are not, from the record presented, persuaded by the contentions of plaintiff; in that we ascertain a difference between the diagnostic function asserted and the observation of adaptive symptoms made by defendant.

This court is aware of countervailing positions taken on this matter by other jurisdictions. In fact, the optometric statutes of those states are essentially the same as the Illinois Act. Plaintiff cites many of these authorities in its brief and, while they are informative on the issue of what constitutes the practice of optometry, they cannot be substituted for the lack of evidence offered at trial. In the absence of sufficient proof necessary to establish a *prima facie* case, we cannot tangentially use these authorities in order to support a position we might be drawn to, but which we believe was inadequately established. A finding of the trial court should not be set aside because this court feels that other conclusions might be more reasonable. *Henry v. Robert Kettell Construction Corp.,* 82 Ill.App.2d 420, 226 N.E.2d 89.

If in plaintiff's opinion the statutes are not as clear and as restrictive as public policy requires, remedial legislation should be sought.

■■ We conclude, therefore, in light of the evidence offered here, that plaintiff failed to prove a violation of the Illinois Optometric Practice Act. Accordingly, we hold that the finding for defendant at the close of plaintiff's case was proper.

For the reasons stated the judgment is affirmed.

Affirmed.

DRUCKER and LORENZ, JJ., concur.