(No. 46515.—

THE PEOPLE *ex rel.* JOHN C. WATSON, Director of Registration and Education, Appellant, v. HOUSE OF VISION, Appellee.

*Opinion filed Nov. 27, 1974.—Rehearing denied Jan. 28, 1975.*

WARD, J., took no part.

William J. Scott, Attorney General, of Chicago (Donald S. Carnow, Special Assistant Attorney General, of Chicago, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Max E. Wildman, Lawrence J. West, Rupert J. Groh, Jr., and James P. Dorr, of counsel), for appellee.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

On July 6, 1965, the People, on the relation of John C. Watson, Director of the Department of Registration and Education, filed a complaint in the circuit court of Cook County seeking to enjoin the defendant, House of Vision, Inc., a large optical dispensing company, from continuing its practice of allowing employees not licensed as optometrists to fit customers with contact lenses. The plaintiff contended that the acts involved in such fitting constituted the practice of optometry within the meaning of section 3 of the Illinois Optometric Practice Act (Ill. Rev. Stat. 1965, ch. 91, par. 105.3).

Over six years later, in October of 1971, the case was finally tried. At the close of the plaintiff's case, the trial judge concluded, as a matter of law, that the acts performed by the defendant did not constitute the practice of optometry. He therefore granted the defendant's motion for judgment in its favor and dismissed the complaint. The Appellate Court, First District, affirmed (16 Ill. App. 3d 487), and we granted leave to appeal.

Section 3 of the Act provides:

> "The practice of optometry is defined to be the employment of objective or subjective means, or both, for the examination of the human eye and its appendages, without the use of drugs, medicine, or surgery, for the purpose of ascertaining any departure from the normal, measuring its powers of vision, and adapting lenses or prisms, ocular exercises, visual training, or any other method other than the use of drugs, medicine, or surgery, for the aid thereof. A person shall be deemed to be practicing optometry within the meaning of this Act who in any way advertises himself to be an optometrist, or who shall employ any means for the measurement of the powers of vision or the adaptation of lenses or prisms for

the aid thereof, or who shall practice or offer or attempt to practice optometry, as herein defined, either on his own behalf or as the employee of a person, firm, or corporation, whether under the supervision of his employer or not, or who shall use testing appliances for the purpose of measurement of the powers of vision or diagnose any ocular deficiency or deformity, visual or muscular anomaly of the human eye or prescribe lenses, prisms, or ocular exercise for the correction or relief thereof, or who holds himself out as qualified to practice optometry. Nothing in this section shall be interpreted to prevent a person from acting as an assistant under the direct supervision of a person licensed by the State of Illinois to practice optometry or medicine and surgery, or to prohibit visual screening programs conducted by charitable organizations acting in the public welfare under the supervision of a committee composed of persons licensed by the State of Illinois to practice optometry and persons licensed by the State of Illinois to practice medicine and surgery." Ill. Rev. Stat. 1965, ch. 91, par. 105.3.

Simply described, the procedures followed by the defendant's employees with respect to contact lenses are as follows:

The customer brings in a normal spectacle prescription from an opthalmologist or optometrist on which the prescribing doctor has noted that it is "O.K." to fit the patient with contact lenses. The spectacle prescription contains the refractive (*i.e.*, corrective) power of the lens for each eye, and sometimes also the vertex distance (*i.e.*, distance of the spectacle lens from the eyeball). These prescriptions are not sufficient by themselves to fabricate a contact lens. They give no indication of the shape of the wearer's cornea, on which the contact lens must fit. This determination is made by the defendant's employee.

The first step in this procedure is the measuring of the approximate spherical curvature of the wearer's cornea. This is done by using an optical analytical device known as a keratometer. Because the keratometer is incapable of measuring an irregular cornea, this process is only the

starting point for a fitting. Three keratometer readings are taken and averaged together, after which the fitter uses a chart to translate the result into a specific lens shape. He then selects a trial lens of this shape and places it on the wearer's cornea.

A contact lens, when properly fitted, is designed to rest on the tear layer covering the eye and on the outer layer of the cornea, which is called the epithelium. The epithelium is a tissue which acts as a protective covering for the cornea. To maintain its normal structure, function, and metabolism, the epithelial tissue requires a constant supply of oxygen. Normally, the cornea receives oxygen directly from the air through diffusion by the tear layer. But since a "hard" contact lens is not permeable, it must be designed to permit adequate tear flow underneath it in order to supply the epithelial cells it covers with oxygen. If it does not do so, these cells will be altered or die.

To determine proper tear flow, the fitter places a clear, nontoxic chemical, fluorescein, in the wearer's eye. He then examines the part of the eye covered by the contact lens with a magnifier equipped with an ultraviolet light which causes the fluorescein to glow green. By observing the depth of the fluorescein color the fitter determines whether there is proper tear flow behind the lens and what its rate of circulation is. He also determines whether any part of the trial lens is too tight or too loose on the cornea. There is no machine or chart to aid the fitter in reading these fluorescein patterns, which may be misinterpreted for a number of reasons. This is a skill which is acquired through training and experience.

Based upon his evaluation of the fluorescein patterns, the fitter may then select a trial lens of a different size and repeat the process. When he has finally determined a lens of the proper curvature to fit the cornea, he fills in an order form supplied by the manufacturer of the contact lenses. On this form the fitter writes in the spectacle prescription supplied by the prescribing doctor and, if

indicated, the vertex distance. He then uses a transposition chart to convert these figures into an "adjusted" prescription, after which he notes the curve of the trial lens finally selected. The trial lens curve and the adjusted spectacle prescription are then converted by means of an arithmetic computation to the final power of the contact lens. The fitter may vary this power to a small degree to compensate for the refractive effects of the tear layer underneath the lens, as observed through the fluorescein patterns.

After the lenses have been manufactured, the customer returns to have the finished lenses fitted to him. At this time the fitter repeats his fluorescein pattern test and, if it appears satisfactory, gives the customer a wearing schedule. Two weeks later the customer returns and is questioned by the fitter regarding his reaction to the lenses. Complaints by the customer may include such things as a burning sensation from the lenses, sensitivity to light, pain, blurred vision, foggy vision, inability to read, and other matters. These comments aid the fitter in determining whether the lenses should be redesigned or whether the customer simply has not worn them properly. After the customer's subjective comments have been elicited, the fitter makes an objective examination of the cornea, both with and without fluorescein, to determine the fit and to check for any pathological conditions such as scratches, staining, stippling, or swelling which would indicate faulty lens design. After this examination, the customer is advised to make an appointment with his eye doctor within the following two or three weeks. This medical checkup will, therefore, normally only occur after the customer has been wearing his lenses for several weeks, unless the fitter notices damage to the eye at the first examination and refers the customer immediately to an eye doctor for treatment.

The plaintiff contends that these procedures, when viewed in their entirety, amount to the "adaptation" of lenses for the aid of the powers of vision. The defendant

attempts to make a detailed semantic and logical rebuttal of such an interpretation. Neither party, however, mentions what we consider to be a significant indication of legislative intent, *viz,* the 1946 Attorney General's opinion regarding the applicability of the almost identical language of the 1945 Optometric Practice Act to the fitting of contact lenses. This opinion was issued to the Director of the Department of Registration and Education and was published (1946 Ill. Att'y Gen. Rep. No. 427, at 165). It concluded that the fitting of contact lenses was within the language of the Act.

The 1945 Optometric Practice Act had language very close to that of the present act. It read, in pertinent part:

"Any one or any combination of the following practices constitutes the practice of optometry:

* * *

(b) The prescription *or adaptation;* of lenses *** to correct or alleviate defects or abnormal conditions of the human eye ***." Ill. Rev. Stat. 1945, ch. 91, par. 91. (Emphasis added.)

While the present act does not have an introductory statement indicating the disjunctive nature of the practices that it describes, it does state those practices disjunctively, and the effect is the same. We see no reason to ignore the plain meaning of the language in order to read this provision partially in the conjunctive as did the appellate court. We hold that the "adaptation of lenses or prisms for the aid [of the powers of vision]," by itself, is sufficient to constitute the practice of optometry.

The 1946 opinion of the Attorney General dealt with the fitting of scleral contact lenses. The instant case involves the fitting of corneal contact lenses. The scleral lens, which rests on the white part (sclera) of the eyeball and covers the cornea without touching it, is fitted in a slightly different manner from the corneal lens.

A scleral lens is fitted by first taking an impression mold of the wearer's eyeball. After the necessary refractive qualities are ground into this lens, it is fitted to the

wearer's eyeball and any corrections necessary to secure a proper fit are made. Although the corneal lens is fitted without the taking of impression molds, its fitting procedure resembles the latter stages of a scleral lens fitting.

The 1946 opinion did, however, address itself specifically to these latter stages of scleral lens fitting:

> "In view of the foregoing provisions [of the Optometric Practice Act], it is my opinion that the activities you describe in so far as they include examination of the eye to ascertain the presence of defects or abnormal conditions which may be corrected by the use of contact lenses; the taking of an impression mold of the eyeball from which a contact lens is to be cast; the determination of the corrective qualities to be incorporated in the lens by grinding, shaping or other means to develop the proper refractive qualities, whether done to correct or alleviate defects or abnormalities of the eye or to adjust it to the conditions of a specific occupation or environment; *or the adjustment or fitting of the lens to the eye, constitute the practice of optometry.*" (Emphasis added.) 1946 Ill. Att'y Gen. Rep. No. 427, at 167.

In 1951 the General Assembly repealed the 1945 act and enacted the present statute. At that time corneal contact lenses had been in existence for four years. Nevertheless, the language of the 1945 act was, in essence, incorporated into the 1951 act and no specific exemption was provided for the fitting of contact lenses.

In 1962 the Attorney General issued another opinion which reiterated his 1946 interpretation and made it specifically applicable to the language of the 1951 act. (1962 Ill. Att'y Gen. Rep. No. 751, at 534.) The General Assembly has taken no action to alter this language or to make it inapplicable to the fitting of contact lenses. A consistent construction of this act has thus been acquiesced in by the legislature for over 28 years. A reasonable construction of an ambiguous statute by the governmental officers or departments charged with its enforcement, if contemporaneous, consistent, long-continued, and in concurrence with legislative acquiescence, creates a presump-

tion of correctness which is only slightly less persuasive than a judicial construction of the same act. *Fried v. Danaher* (1970), 46 Ill.2d 475, *appeal dismissed,* 402 U.S. 902, 28 L. Ed. 2d 643, 91 S. Ct. 1382; *McNely v. Board of Education* (1956), 9 Ill.2d 143; *People ex rel. Spiegel v. Lyons* (1953), 1 Ill.2d 409; *Cory Corporation v. Sauber* (1960), 363 U.S. 709, 4 L. Ed. 2d 1508, 80 S. Ct. 1331.

The phrase "adaptation of lenses" does not refer to the fitting of spectacle frames containing prescription lenses to the face and head of the wearer. In such cases all of the lens curvatures have been previously formulated by an optometrist or opthalmologist specifically to aid the vision of the person involved, and the optician's job is to position the lenses correctly in front of the wearer's eyes. He does not make any determinations regarding the curvatures of the lenses.

The fitting of contact lenses, on the other hand, requires the optician to determine some of the curvatures of the lenses themselves in order to properly fit them to the wearer's eye. Thus, his efforts are directed at making the lenses suitable for the eye, rather than making the frames suitable for the face. In doing this the optician uses procedures that require him to come into actual contact with the customer's eyeball.

In our opinion the construction given to the word "adaptation" by the Attorney General was correct. Courts of other jurisdictions have given the same construction to similar statutes. See *State ex rel. Danforth v. Dale Curteman, Inc.* (Mo. 1972), 480 S.W.2d 848; *State ex rel. Reed v. Kuzirian* (1961), 228 Ore. 619, 365 P.2d 1046, 88 A.L.R.2d 1284; *Pennsylvania Optometric Association, Inc. v. DiGiovanni* (C.P. Phila. County 1968), 45 Pa. D. & C.2d 245; *Fields v. District of Columbia* (D.C. Ct. App. 1967), 232 A.2d 300; *Florida Association of Dispensing Opticians v. Florida State Board of Optometry* (Fla. 1970), 238 So. 2d 839; *contra, State ex rel. Londerholm v. Doolin* (1972), 209 Kan. 244, 497 P.2d 138; *High v. Ridgeway's Opticians*

(1963), 258 N.C. 626, 129 S.E.2d 301; *State Board of Optometry v. Chester* (1964), 251 Miss. 250, 169 So. 2d 468.

The judgments of the circuit and appellate courts are reversed, and the cause is remanded to the circuit court of Cook County for further proceedings consonant with this opinion.

*Reversed and remanded,*
*with directions.*

MR. JUSTICE WARD took no part in the consideration or decision of this case.