MICHAELANGELO J. PALELLA *et al.*, Plaintiffs-Appellees and Cross-Appellants, *v.* LEYDEN FAMILY SERVICE & MENTAL HEALTH CENTER *et al.*, Defendants-Appellants and Cross-Appellees.—(THE VILLAGE OF VILLA PARK *et al.*, Defendants.)

Second District   No. 78-492

Opinion filed June 25, 1979.

SEIDENFELD, J., dissenting.

Matthew J. Piers, of Clark, Thomas & Piers, of Chicago, for appellants.

Douglas Drenk and Gregory N. Freerksen, both of Law Offices of A. E. Botti, of Wheaton, for appellees.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

Leyden Family Service & Mental Health Center and West Suburban Detoxification Center (hereinafter referred to as "WSDC") appeal from the order of the circuit court enjoining the operation of a nonmedical detoxification facility on the premises known as Acre View, Inc.

Acre View, consisting of an older frame building and a more modern adjoining brick building, parking lot and surrounding grounds, is located at 1330 Villa Avenue in the Village of Villa Park. Until November of 1967, Acre View had been outside the village limits, but in November 1967 it was annexed to Villa Park and at that time by virtue of Ordinance 1019, dated November 6, 1967, a special use was granted for the operation of Acre View as a nursing and convalescent home. The ordinance reads in pertinent part as follows:

> "2. This special use permit is hereby granted under the provisions of Village Ordinance No. 861, Section 25—10, A(h) [the village zoning ordinance]. The petitioners shall be permitted to operate a private nursing and convalescent home on the premises herein described. Said nursing and convalescent home shall not be converted to a hospital, nor to an institution for the care of the insane or feeble minded, but shall continue to operate under a special use permit under the same or similar conditions to those existing at the time of the annexation of said Acre View Nursing Home now located upon the premises.
>
> 3. The term of this special use permit shall be for as long a period of time as the property is being used for present nursing home and convalescent purposes and shall expire upon a termination of the use of the property or any portion thereof for such purposes."

Early in 1978, Donald Goncher, owner of Acre View, decided to convert part of the property to a day-care center for older adults. He inquired of the village authorities if this would be permissible and was advised by the village manager in a letter dated March 20, 1978, that "your conversion of Acre View from a nursing home operation to an adult day care center appears to be within the scope of your special use permit and in accordance with the definitions set forth in our Village Ordinance 1195 [the general zoning ordinance]."

Accordingly, Goncher began to operate the adult day care center on a portion of the premises while preparing to phase out the nursing home operation. It was about at this time that the Leyden Family Service & Mental Health Center, a not-for-profit operation operating with public funds, approached Goncher with the view of arranging a lease of Acre View, or a part thereof, for the operation of a nonmedical detoxification center under the name of West Suburban Detoxification Center.

A word about the social phenomenon known as a nonmedical or social setting detoxification center might be appropriate at this point for clarification. In 1976, the State Legislature enacted the Alcoholism and Intoxication Treatment Act (Ill. Rev. Stat. 1977, ch. 91½, par. 501 *et seq.*) in response to a growing awareness of the inadequacy of prevailing handling and treatment of alcoholics, who were usually arrested and jailed for public drunkenness and put into so-called "drunk tanks" to sleep it off, after which they were charged with a misdemeanor and fined. Section 1 of the Act sets out the State policy as follows:

"It is the policy of this State that alcoholics and intoxicated persons engaged in public drunkenness may not be subjected to criminal prosecution solely because of their consumption of alcoholic beverages but rather should be afforded a continuum of treatment in order that they may lead normal lives as productive members of society."

The Act, in subsequent provisions, is clearly concerned with the prevention and treatment of alcoholism generally and not merely with public intoxication. West Suburban Detoxification Center is a facility financed by a State grant and designed to achieve the purposes of the Alcoholism and Intoxication Treatment Act. The testimony of Dr. Lee Gladstone, an expert on alcoholism who piloted the initial detoxification facility, described the treatment at such facilities as follows:

"The centers receive the intoxicated person, help him through a withdrawl [*sic*] phenomena where he most of the time sleeps it off, so to speak, and then the remaining time that they spend in the social setting detoxification is to develop a relation with them which would be warm and accepting and help them link to long-term facilities to help them with that addiction.

That's basically the treatment. There are no medicines used in our social setting detoxification center, with the exception of vitamins and food supplements.

\* \* \*

There are no restraints used."

Further testimony indicated that admission to such facility was on a purely voluntary basis, except that in some cases a person who was intoxicated in public might be driven to the center by the police. However, such person is not forced to remain there if he chooses to leave, although this would be discouraged, and if possible a former member or friend would be called in order to assist him, if he insisted on leaving while intoxicated. The average stay in the facility was three or four days, with a maximum stay of five days.

The testimony indicates that some time following the initial meeting between Gonscher and representatives of WSDC, the attorney for WSDC inquired of the village authorities as to what procedure was necessary to operate a detoxification facility at Acre View. The matter was referred to the village attorney and at the regular council meeting of June 26, 1978, the question of operating the detoxification facility was brought up. The minutes of that meeting read as follows:

"Attorney Faris [village attorney] reviewed Ordinance #1019 regarding the Special Use for Acre View Nursing Home. He advised that it is his legal opinion that the detoxification center does come under the purview of the ordinance."

A substantial number of citizens attended the meeting and spoke for or against the operation of the facility at Acre View. However, there was no special meeting or hearing on that subject alone. There is no record of any written communication from the village to WSDC or to Gonscher following the meeting. However, Gonscher and a representative of WSDC testified they were present at the meeting. It is alleged to Leyden's answer to the complaint that on or about July 10, 1978, the Board of Trustees of Villa Park "informed and advised these defendants and their agents that the proposed operation of a detoxification center on the premises commonly described as 1330 South Villa Avenue, Villa Park, was authorized pursuant to the special use permit granted by the Village of Villa Park on or about November 6, 1967." This allegation is not denied by the village.

On July 19, 1978, the plaintiffs, being five residents in the neighborhood of Acre View and living within 1200 feet thereof, filed their complaint for preliminary and permanent injunction. The complaint was later amended. The first amended complaint is in three counts, counts I and II being for a preliminary and permanent injunction to restrain the

defendants from operating the facility at Acre View as a detoxification facility and count III for a writ of mandamus to compel the village to hold a public hearing on the question of the special use granted to WSDC to operate a detoxification facility at Acre View. In their complaint, plaintiffs invoke section 11—13—15 of the Illinois Municipal Code (Ill. Rev. Stat. 1977, ch. 24, par. 11—13—15), reading as follows:

"Proceedings to prevent violations.] * * * In case any building or structure, including fixtures, is constructed, reconstructed, altered, repaired, converted, or maintained, or any building or structure, including fixtures, or land, is used in violation of an ordinance or ordinances adopted under Division 13, 31 or 31.1 of the Illinois Municipal Code, or of any ordinance or other regulation made under the authority conferred thereby, the proper local authorities of the municipality, or any owner or tenant of real property, within 1200 feet in any direction of the property on which the building or structure in question is located who shows that his property or person will be substantially affected by the alleged violation, in addition to other remedies, may institute any appropriate action or proceeding (1) to prevent the unlawful construction, reconstruction, alteration, repair, conversion, maintenance, or use, (2) to prevent the occupancy of the building, structure, or land, (3) to prevent any illegal act, conduct, business, or use in or about the premises, or (4) to restrain, correct, or abate the violation. When any such action is instituted by an owner or tenant, notice of such action shall be served upon the municipality at the time suit is begun, by serving a copy of the complaint on the chief executive officer of the municipality, no such action may be maintained until such notice has been given.

In any action or proceeding for a purpose mentioned in this section, the court with jurisdiction of such action or proceeding has the power and in its discretion may issue a restraining order, or a preliminary injunction, as well as a permanent injunction, upon such terms and under such conditions as will do justice and enforce the purposes set forth above.

If an owner or tenant files suit hereunder and the court find that the defendant has engaged in any of the foregoing prohibited activities, then the court shall allow the plaintiff a reasonable sum of money for the services of the plaintiff's attorney. This allowance shall be a part of the costs of the litigation assessed against the defendant, and may be recovered as such.

An owner or tenant need not prove any specific, special or unique damages to himself or his property or any adverse effect

upon his property from the alleged violation in order to maintain a suit under the foregoing provisions."

It will be noted that while there is no record of the village having, through its elected officials, granted a special use permit for the operation of a detoxification facility on the premises of Acre View, their pleadings admit they interpreted Ordinance 1019, the ordinance relating to the special permit for a nursing and convalescent home, as covering the operation of the detoxification facility, and the village does not deny Leyden's allegation that such interpretation was communicated to WSDC or to Gonscher. In any event, the plaintiffs have alleged in their amended complaint, as a basis for invoking section 11—13—15 of the Illinois Municipal Code that the village "granted a special use unto the West Suburban Detoxification Center [and to other defendants]." While the village denied that allegation in its answer, it does not deny that such was its interpretation of the ordinance in asserting the right to make such interpretation under home-rule powers. Ill. Const. 1970, art. VII, §6.

In view of the fact that the defendant's (Leyden's) attorney had inquired as to the necessary procedure for approval of the operation of WSDC at Acre View, before the lease with its owner, Gonscher, was concluded, we think the referring of the question to the village attorney, his interpretation that Ordinance 1019 allowed such operation within its scope, the announcement of such interpretation by the village attorney at a regular meeting of the village council and the failure of the council to take any subsequent action contrary to its attorney's interpretation, amounted to a positive decision by the village council to allow the operation of the detoxification facility without a further ordinance. Whether this was an "executive" decision or an "administrative" decision, as was argued at the trial, it was, we think, more than a mere "non-action" by the village authorities, as it was termed by the trial court.

It is noted, indeed, that in its amended complaint the plaintiffs alleged that on or about July 10, 1978 (which is subsequent to the village attorney's public interpretation of Ordinance 1019), "the Village of Villa Park Board of Trustees, and its president, Willard Phillimore, granted a special use unto West Suburban Detoxification Center, the Leyden Family Service & Mental Health Center, Donald J. Goncher and Acre View, Inc." Whether this is an accurate characterization of what occurred or not (and the village in its answer denied it had granted any such special use), the allegation is nevertheless of more than simple "non action." It is evident that in the minds of both the lessors and lessees of Acre View, who comprise the defendants, and the nearby residents who comprise the plaintiffs, the conduct of the village was a positive affirmation of hopes on the one side and fears on the other that the village fathers regarded the

detoxification facility at Acre View as a proper and legal operation. It was clearly on that basis that Leyden Family Service & Mental Health Center contracted a lease with Acre View and expended moneys and the neighbors in question sued for an injunction to stop the operation of WSDC, the source of both actions being the same—the conduct of the village council.

We think it is fair to say then that the village did make a decision and the first question which arises on this appeal is whether the plaintiffs can disregard that decision in invoking section 11—13—15 of the Illinois Municipal Code. At the trial of this case the village contended that its decision was merely an interpretation of its own ordinance, and under home-rule powers it should be held to have the power to interpret its own zoning ordinance and to determine whether or not such ordinance has been violated. The plaintiffs counter with the argument that the ordinance was passed some 11 years prior to the present controversy, and no contemporary or consistent interpretation of the ordinance is available to lend weight to the present decision, thus the rules with regard to an interpretation of an ambiguous statute by governmental officials or departments charged with its enforcement, as stated in *People ex rel. Watson v. House of Vision* (1974), 59 Ill. 2d 508, do not apply here.

While we agree that the *House of Vision* case is not applicable here we would not in any case be inclined to decide the issue in this case solely on the weight to be accorded the opinion of the village attorney. The *House of Vision* case did not involve home rule, which is an element in this case. Equally important, there could be no consistent or continued interpretation that would be helpful here because the social setting detoxification center involved in this case is a new and experimental social institution for which there is, so far as we know, no legal precedent. Rather, we think the question is what effect should be given to the conduct of the village trustees, who in open meeting, after referring to him for his opinion, heard the village attorney's opinion, and so far as we can gather from the testimony and the pleadings, approved and accepted it in the presence of both the proponents and the opponents of the continuance of the special use permit. Indeed, it is alleged by the defendants and also in the complaint of the plaintiffs, that the village, through one of its representatives, confirmed the decision of the village board subsequently on July 10, 1978, apparently in an oral communication. Certainly the indignation of the surrounding neighbors indicated by their subsequent suit for injunction and the actions of the defendants in acting on the lease and making certain structural changes and moving in equipment following the meeting of June 26, would indicate that the common understanding was that the village had approved the

operation of the detoxification facility under the village attorney's interpretation of the 1967 Ordinance 1019.

Since there appear to be no precedents either for or against the operation of a detoxification facility under a special use permit granted for a nursing home or sanatorium, we must consider the question of similarity of use within the framework of a decision by a municipality empowered under Home Rule provisions to, in the words of section 6(a) of article VII of the 1970 Constitution, "exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; * * *."

While we do not hesitate to affirm the obvious and oft-repeated doctrine of the supremacy of the judiciary in interpreting statutes and ordinances, this we think has to do with the power of final adjudication. It does not mean that legislative bodies cannot or should not interpret their own ordinances. Obviously, in the every day affairs of the community they should and must do so. Rather, therefore, the question is how much weight is to be given by the court in a novel case to the interpretation of the legislative body which authorized the ordinance and whose responsibility it is to apply it to the conditions of the moment.

■▌ Little or no weight need be given to an interpretation of a statute, even by responsible legal authorities such as the Attorney General or the village attorney, which is contrary to long-standing judicial decision. On the other hand, in dealing with a situation which is so peculiarly susceptible to the exercise of home-rule powers as a zoning matter is and particularly in dealing with a zoning problem which has no precedent because it involves a use which is new, experimental and not contemplated at the time of the zoning code's enactment, the interpretation of the legislative body's challenged ordinance should carry a great deal of weight.

■▌ While, therefore, the court has the final determination and can override the legislative body's interpretation if it is necessary to do so in order to serve justice and uphold the law, yet we think, especially in the case of a home-rule municipality's zoning ordinance, the error should be clear and the injustice substantial, before the legislative interpretation is overthrown by issuance of an injunction. We do not regard this as such an open and shut case. Reasonable men could, we think, differ as to whether the operation of a detoxification facility is sufficiently "similar" to that of a nursing home to allow a special use granted for the latter to cover the operation of the former.

They are different, of course, but they are fundamentally similar. Both are voluntary; both answer a social' need and both attempt to

rehabilitate human beings physically and psychologically. There are many differences—the short length of stay in one case as compared with long term treatment of the other, specialization in the case of the detoxification facility as compared with the general and varied treatment in the sanatorium or convalescent home and the greater medical facilities in the latter. But while these are differences between the two types of institutions, they do not, in our opinion, rob them of their similarities—the fundamental objective in both cases is the rehabilitation of a sick human being in mind and body or both.

To the immediate neighbors, the detoxification center is a nuisance and a potential danger, as well as an economic liability, yet there was no evidence that the traffic would significantly increase by reason of the detoxification facility, as compared with the operation of a rest home or nursing home, and such evidence as was adduced at trial regarding the possibility of violence or crime was tenuous and derived from personal prejudice or rumor. The previous sanatorium had probably less than a normal traffic pattern as it was being phased out because of physical problems. None of the testimony indicated a large volume of traffic in and out of the facility as being probable. As to the economic effects, they are speculative in view of the fact that the existing building would be unchanged and nothing would be added. If such facilities serve a socially desirable objective, they have a reason for being and they must have a location which, in the language of the Alcoholism and Intoxication Treatment Act, is "conveniently near population centers so as to be quickly and easily accessible to patients." This practical requirement almost forecloses the establishment of such a center where there is no possibility of a neighbor objecting. Indeed, the testimony at trial discloses the long and arduous search made by the sponsors of the center before selecting Acre View as a practical possibility. The connotation of drunkenness being what it is, we are inclined to think that it would be practically certain that there would be individuals objecting to the facility in any center of population where it might be located. This, of course, is not to ignore the spirit and purpose of section 11—13—15 of the Illinois Municipal Code or to suggest that where social good is intended, individual citizens are without a remedy under that section, but we think it is a statute which requires explicit violation of the zoning laws of the community to implement it. There must be more than an adverse reaction by nearby residents to a social experiment in their neighborhood.

■■ We see no clear violation of the zoning ordinance in continuing the special use it granted originally for the operation of the nursing home and, therefore, no basis for the injunction issued by the trial court under section 11—13—15 of the Illinois Municipal Code. We think the detoxification center's similarities to a nursing home are more

fundamental than their differences, and thus we see no question of dereliction of duty or conspiracy to evade the force of the zoning laws by the village authorities. We regard the controversy in this case as springing from a reasonable difference of interpretation. Consequently we do not regard section 11—13—15 of the Illinois Municipal Code, invoked here, as applying, since we do not consider the village zoning ordinance to have been violated by the permitted use.

The judgment of the circuit court of Du Page County is reversed.

Judgment reversed.

NASH, J., concurs.

Mr. JUSTICE SEIDENFELD, dissenting:

The majority, in my view, have chosen to disregard the clear meaning of words used in an ordinance. The special use was extremely limited. It was confined to a "private nursing and convalescent center"; it further narrowed the grant by specifically stating that the use "shall not be converted to a hospital, nor to [a mental institution] * * *," although in granting the special use the village had expressly provided that the nursing and convalescent home was being allowed under the special use provision of the general ordinance designated as "[H]ospitals or Sanatoriums" (Village Ordinance No. 861, §25—10(A)(h)). And to make even more clear the narrowness of the grant, the village provided against a more intensive or expanded use even as a private nursing and convalescent home by stating that it shall operate "under the same or similar conditions" as those existing at the time of the annexation. And then to make its intention even more clear it limited the term of the permit to "as long a period of time as the property is being used for *present* nursing home and convalescent purposes." (Emphasis added.)

From this the majority concludes that anything similar to a nursing and convalescent home is permitted under the special use and that it is therefore unnecessary to require compliance with procedures to secure a change in the ordinance, including a hearing at which the adjoining property owners, who have at all times objected to the use, may be heard.

The majority opinion dwells at length on the salutary social purpose of the detoxification program, as to which there is neither any dispute, nor, I think, any relevance. The opinion concedes that the village did not grant a special use for a detoxification center, and the village has so stated in its answer. Thus the essential basis for the majority's conclusion is that there has been a legislative interpretation of the meaning of the special use ordinance with which the courts should not interfere.

The opinion properly concedes that the result may not be based on

the weight to be accorded the opinion of the village attorney; but the majority concludes that the opinion of the attorney which the village impliedly adopted as a legislative decision by permitting the detoxification center to go ahead, however, is entitled to great weight. Yet the majority concedes that the rules with regard to the interpretation of an allegedly ambiguous statute by government officers or departments charged with its enforcement do not apply here. (See *People ex rel. Watson v. House of Vision*, 59 Ill. 2d 508, 514-15 (1974). See also *First National Bank & Trust Co. v. City of Rockford*, 47 Ill. App. 3d 131, 141-42 (1977).) They base the result on the fact that the village of Villa Park as a home-rule municipality (which, incidentally, was not proved of record and which has been denied) can, without interference, interpret an ordinance passed by a previous legislative body some 11 years before. Why, because the question pertains to "its government and affairs."

I fail to see how a home-rule authority can preempt judicial review in this manner, and no authorities are cited. The general rule is that legislators are "without authority to state explicitly how the judiciary shall construe a statute [or ordinance]." (*People v. Crawford Distributing Co.*, 53 Ill. 2d 332, 338 (1972). See also Ill. Const. 1970, art. II, §1.) Thus, it seems clear that the trustees' silence on the evening of June 26, 1978, assuming it is an acquiescence in the village attorney's opinion, is not in any sense controlling on the courts. Even if it might be argued that the legislators' construction of the ordinance, although not controlling, is persuasive authority, the trustees' silence here would be of little value since it is a construction mechanically imposed 11 years after the date of the enactment. In an analogous Federal situation, the Supreme Court has held that, "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." (*United States v. Price*, 361 U.S. 304, 313, 4 L. Ed. 2d 334, 340, 80 S. Ct. 326, 332 (1960). See also *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 354 n. 39, 52 L. Ed. 2d 396, 426-27 n. 39, 97 S. Ct. 1843, 1864 n. 39 (1977); *Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 22 Ill. 2d 305, 322 (1961).) There is no indication in the record that the 1978 trustees had any special insight as to what their predecessors intended to do some 11 years earlier. Indeed, it would seem that the trial judge in the instant case was in as good a position as the 1978 trustees to discern the legislative intent that formed ordinance 1019 in 1967.

I would therefore affirm that portion of the trial court's judgment, and would reach the homeowners' cross-appeal seeking to reverse that part of the trial court's judgment which denied their motion for attorney's fees.

The trial court denied any attorney's fees in the exercise of what it considered its discretion. However, a successful plaintiff in an action

under section 11—13—15 of the Municipal Code is entitled to the award of reasonable attorney's fees. In *Meyer v. Marshall*, 62 Ill. 2d 435, 439 (1976), the Illinois Supreme Court interpreted the statute as amended as making "the allowance of attorneys' fees mandatory, rather than discretionary * * *," based on a finding that the defendant has engaged in prohibited activities. I would remand this issue to the trial court for a further hearing.