FIRST NATIONAL BANK & TRUST CO., Trustee, Plaintiff-Appellee, *v.* THE CITY OF ROCKFORD, Defendant-Appellant.—(ELEANOR IANNI *et al.*, Intervenors-Appellants.)

Second District (1st Division)   No. 75-435

Opinion filed March 29, 1977.

Stephen W. McCarty, of Rockford, for appellant City of Rockford.

Karl F. Winkler, of Roszkowski, Paddock, McGreevy & Johnson, of Rockford, for appellant Eleanor Ianni.

Louis R. Gilbert, of Gilbert, Powers & Mateer, of Rockford, for appellee.

Mr. PRESIDING JUSTICE GUILD delivered the opinion of the court:
This is an appeal from an order of the trial court (1) granting a writ of mandamus directing the defendant City of Rockford to remove a stop work order which had been posted on plaintiff's real estate; (2) ordering the city to allow plaintiff to complete construction of a condominium building on said real estate in accordance with a certain building permit issued on March 23, 1973; and (3) declaring that plaintiff had become vested with a property right in both a former zoning classification allowing development of a multifamily dwelling and under the aforementioned building permit. The plaintiff is a land trust whose

principal beneficiaries are Wilmer Wolfson and Gary Keye. The defendant is, of course, the City of Rockford, a municipal corporation. The trial court also allowed several persons who own single-family residences in the area immediately surrounding plaintiff's real property to intervene, and these people will hereinafter be referred to as the intervenors. Both the city and the intervenors have appealed from the aforementioned order of the trial court.

The real estate in question is a vacant tract of land presently consisting of approximately 3.2 acres located at 2601 Montedera Drive in the City of Rockford. This is also commonly known as the Koplos tract. It, and an adjoining piece of property known as the Doyle tract, are the only large undeveloped parcels of land in an area consisting predominently of single-family residences. Between 1967 and 1969 Mr. Wolfson conducted various negotiations with the owners of the Koplos tract and eventually they reached an agreement whereby Wolfson offered $65,000 for the tract contingent upon the rezoning of it to allow development of his proposed apartments, townhouses or condominiums. On March 17, 1969, the major portion of the Koplos tract was rezoned from single-family residential to "C" residential, which allowed multifamily development. Single-family residential zoning was retained on one portion of the tract which fronted on Cerro Vista Drive, as a buffer zone between the existing single-family residences and the multifamily portion, and the buffer zone is not involved in this suit. The tract was purchased for a total price, including real estate broker's commission, of $68,625, and apparently conveyed into a land trust in June 1969. Thereafter the State of Illinois condemned approximately one acre of plaintiff's property for purposes of highway improvements. Plaintiff conveyed this property to the State on July 22, 1970, and was paid $18,700 therefor. The road for which the property was taken was opened in November 1971.

In February 1971 the City of Rockford Zoning Commission was created with the designated purpose of preparing a comprehensive new zoning ordinance for the city. The second draft of the proposed zoning ordinance was made available to the general public in August 1972. On September 25, 1972, Wilmer Wolfson, as beneficiary/agent of the trust, wrote the chairman of the City of Rockford Zoning Commission asking the city to reconsider the portion of the proposed zoning ordinance which would change the zoning on the subject property back to single-family residential. In this letter Mr. Wolfson claimed that the trust had invested a total of $90,000 in the proposed project, including the price of the land itself and other sums representing interest charges and architectural fees. Wolfson attended one public hearing at which the proposed zoning change was discussed and an architect, Bruce Meltmar, appeared and testified on behalf of the trust at a subsequent public hearing. On

December 18, 1972, the chairman of the Zoning Commission replied to Mr. Wolfson's letter notifying him the commission unanimously recommended denying his request to retain multifamily zoning for the subject property.

On December 22, 1972, Wilmer Wolfson applied for and received a temporary building permit to construct a 32-unit condominium on the subject property. This permit stated on the face of it that it was good for 90 days and that it was issued in the place of a regular building permit when plans were not complete. On March 22, 1973, or March 23, 1973, Mr. Wolfson applied for and received a building permit to construct the aforementioned multifamily structure. Paragraph 102.16 of the National Building Code as amended by the City of Rockford, and in effect at the time the permit was issued, provided that every permit issued under the Code "shall expire by limitation and become null and void, if the building or work authorized by such permit is not commenced within ninety days from the date of such permit, or if the building or work authorized by such permit is suspended or abandoned at any time after the work is commenced for a period of ninety days." Mr. Wolfson further testified that he was aware of the 90-day limitation. On April 16, 1973, the City of Rockford adopted a new comprehensive zoning ordinance which became effective on May 15, 1973. This ordinance changed the zoning of plaintiff's property from multifamily to single-family residential. Section 401.3, appearing in the general provisions of this ordinance, provides:

"Where a building permit for a building or structure has been issued in accordance with law prior to the effective date of this Ordinance, and provided that construction is begun within ninety (90) days of such effective date and diligently pursued to completion, said building or structure may be completed in accordance with the approved plans on the basis of which the Building Permit has been issued, and further, may upon completion, be occupied under a Certificate of Occupancy by the use for which originally originated—subject thereafter to the provisions of Article V, 'Nonconforming Uses and Structures.' "

Section 501.4 appearing in article V similarly requires that construction be started within 90 days and diligently prosecuted to completion to be a lawfully established nonconforming use.

Sometime during April 1973 the Gregory Anderson Company, at the request of plaintiff, demolished several buildings which were on the subject property, removed some trees and moved some dirt around. At that point several of the neighboring property owners, including some of the intervenors in this suit, filed suit against plaintiff to stop further construction. Plaintiff was restrained from any further work upon its property from April 16, 1973, until May 2, 1973, when the order was

dissolved and the suit by the neighbors voluntarily dismissed. On June 26, 1973, William P. Anderson, the building official of the City of Rockford, notified Mr. Wolfson that the building permit issued in March of 1973 had expired because of lack of commencement of work within 90 days, as specified in section 102.16 of the applicable building code. The letter further advised Mr. Wolfson that it would be necessary to obtain proper permits before the work might be commenced. No effort was made at that time to reapply for a building permit.

On or about September 6, 1974, R. K. Johnson staked out the proposed building of plaintiff on the subject site. Sometime in either late December 1974 or early January 1975, further work began upon the subject property. Dirt was moved around and some trenches were dug. On January 21, 1975, an employee of the building department of the City of Rockford placed a stop work order on the premises. Thereafter, representatives of plaintiff contacted city officials in an unsuccessful attempt to get them to voluntarily remove the stop work order.

Plaintiff filed its petition for a writ of mandamus to compel the city to remove the stop work order on February 26, 1975. On March 13, 1975, plaintiff filed a supplementary complaint for declaratory judgment in three counts. In count I plaintiff sought to establish that it had vested rights in the previous zoning classification and building permit by virtue of substantial expenditures in good faith reliance thereon. In count II plaintiff attacked the entire comprehensive zoning ordinance of the City of Rockford as being improperly enacted. In count III plaintiff sought to establish that the zoning ordinance was unconstitutional as an ex post facto law or law impairing the security of a mortgage upon plaintiff's property. The neighbors were allowed to intervene and eventually a hearing was held upon plaintiff's petition and supplementary complaint. The trial court entered the order granting the writ of mandamus as prayed and declaring that plaintiff had the aforementioned vested rights. The trial court found against plaintiff as to counts II and III of its supplementary complaint and plaintiff has not appealed therefrom.

The city and the intervenors have filed separate briefs in this court and raised numerous issues going to what we consider both the procedural and substantive aspects of this litigation. We will deal first with the predominantly procedural issues raised.

■■■ Both the city and the intervenors argue that plaintiff's cause of action should be dismissed for failure to · exhaust the available administrative remedies. We note initially that the rule requiring exhaustion is not jurisdictional in nature and is merely a matter of judicial policy, aimed at providing the local officials an opportunity to correct any errors and settle any disputes locally before there is judicial intervention. (*County of Lake v. MacNeal* (1962), 24 Ill. 2d 253, 259, 181 N.E.2d 85, 89;

*Bass v. City of Joliet* (1973), 10 Ill. App. 3d 860, 865, 295 N.E.2d 53, 56.) We note also that both the city and the intervenors brought the issue concerning lack of exhaustion of remedies to the attention of the trial court in their pleadings and arguments and that, by ruling in favor of the plaintiff, the trial court decided implicitly, if not explicitly, that the claimed lack of exhaustion of administrative remedies was not a bar to plaintiff's suit. In the trial court all parties, including the judge, seemed to agree that the main issue involved in this litigation is whether or not plaintiff has a vested right to continue its development of the subject parcel by virtue of its substantial reliance in good faith upon the previous zoning and building permits. These issues of fact seem particularly appropriate for resolution by the courts. Further, we must note that neither the city nor the intervenors have supplied us with the entire text of the relevant city code and ordinance provisions creating the boards of review to which they claim plaintiff should have presented its arguments before resorting to the courts. Therefore, we must admit that we do not even know whether these bodies could grant the relief sought by plaintiff on the basis of substantial expenditures and changes in position creating vested rights. The record does reveal, however, that as early as September 1972, before the zoning ordinance was amended, plaintiff presented claims concerning substantial expenditures in an effort to deter the rezoning itself. Further, plaintiff conversed with several city officials and representatives following the posting of the stop work order in an effort to have it removed. The substance of plaintiff's vested rights claim was also presented at this time. In view of these circumstances we cannot say that the trial court erred in allowing plaintiff to proceed with this action.

■■ On this appeal both the city and the intervenors have argued that plaintiff's claim is barred by laches. They reason that plaintiff's cause of action accrued when it was notified in June 1973 that the building permit had lapsed and not in January 1975 when the stop work order was posted. From there the city and intervenors argue that a delay of 1 year and 8 months in filing suit was unreasonable. We need not, however, consider the merits of this contention. It is fundamental that a party may not urge for the first time on appeal, and for the purposes of overturning the decision below, an argument or theory which was not presented to the trial court. This rule has been applied to the defense of laches. (*Longenecker v. Hardin* (1970), 130 Ill. App. 2d 468, 472, 264 N.E.2d 878, 880; *Scoa Industries, Inc. v. Howlett* (1975), 33 Ill. App. 3d 90, 99, 337 N.E.2d 305, 313.) Inasmuch as we are unable to find any evidence that the city or intervenors argued that plaintiff was guilty of laches in the proceedings before the trial court, we will not consider that argument on this appeal.

■■ In their brief intervenors also argue that mandamus was improperly granted because necessary parties were not joined as defendants in this action. Plaintiff instituted this action solely against the City of Rockford and intervenors argue that both the building official and the zoning official of the city should have been named as parties defendant. Our review of the cases in Illinois indicates that it has been standard practice in the past to join as a party defendant the appropriate municipal official whose acts are sought to be compelled when seeking a writ of mandamus. We have, however, discovered some cases in which both the municipal official and the municipality itself have been joined. (See, *e.g., Cos Corp. v. City of Evanston* (1963), 27 Ill. 2d 570, 190 N.E.2d 364.) We have not, however, found any Illinois cases which decide the question of whether or not the particular official charged with the duty involved is a necessary party in a case such as this. The only case which we have found which directly discusses the issue is *City of Elmhurst v. Kegerreis* (1945), 392 Ill. 195, 64 N.E.2d 450. There the supreme court discussed the effect of a prior judgment rendered in a mandamus action against the superintendent of building construction of the city upon a later suit by the city to enjoin use of a building in a manner which violated the zoning ordinance. In discussing the mandamus action, the supreme court said:

> "The purpose of the suit was to coerce him to perform a corporate act of the city, *viz.*: the issuance of a permit * * *. He was not sued personally, but in his official capacity. The suit could have been brought against the city and the same relief obtained, even though its superintendent of building construction was not a party to the action. The purpose of the suit was to compel official corporate action by the superintendent of building construction, acting for and on behalf of the city. * * * It being a suit to compel official corporate action by an officer of the city, it was, in effect, and to all intents and purposes, a suit against the city. The duty sought to be enforced, although it was to be discharged by an officer of the corporate body, acting for and on behalf of the city, was, nevertheless, a corporate duty and the *mandamus* suit might, with equal propriety, have been brought against the corporation, alone. The effect and the ultimate result would have been precisely the same. [Citation.]" (392 Ill. 195, 203-04, 64 N.E.2d 450, 453-54.)

To the same effect is *Betebenner v. Board of Education* (1949), 336 Ill. App. 448, 456, 84 N.E.2d 569, 573, wherein the court said that a teacher seeking to compel his continued employment could properly bring suit against either the school board and its members in their official capacities or the high school district alone. We find the rationale in *Kegerreis* to be

persuasive. It is the city which has chosen to require that plaintiff obtain a building permit. The fact that the city has designated one particular person to be in charge of issuing such permits and otherwise enforcing its building code does not, in our opinion, have the effect of making these activities something less than the official corporate acts of the city. If, as stated in *Kegerreis*, the city alone may properly be compelled to issue a wrongfully denied building permit, we believe it may also properly be compelled to remove a wrongfully posted stop work order.

Both the city and the intervenors further argue that mandamus was improperly granted because the party whose acts were sought to be compelled had no authority to comply with the writ. They argue that under the city ordinances the building official could not properly remove the stop work order until the plaintiff's construction complied with the current zoning regulations. This argument, of course, overlooks the fact that the trial court directed the writ to issue against the zoning administrators as well as the building department officials. There is, however, a further flaw in this argument. The essence of the argument is that none of the city officials have authority to issue permits or approve actions by any person which are not in accordance with the current city zoning ordinance. We have examined the cases cited to us by the parties in support of this argument and find that they have no application whatsoever to the factual situation herein. *People ex rel. Green v. Board of Commissioners* (1898), 176 Ill. 576, 52 N.E. 334, held that the Cook County Board had no authority to hear complaints regarding tax assessments because the State statute which had previously authorized them to do so had been repealed. *Fortner v. Hill* (1943), 319 Ill. App. 521, 49 N.E.2d 264 (abstract), apparently denied a writ of mandamus because the petitioner had not complied with the applicable provisions of the Civil Practice Act regarding the form of transcript, proceedings, and exhibits to be submitted to the trial judge for certification. Neither of these cases had anything to do with the alleged inapplicability of a municipal zoning ordinance. If, as contended by plaintiff in this suit, the zoning ordinance cannot properly be applied to it by reason of its previously acquired vested rights, then its lack of compliance with the current zoning ordinance is immaterial. The order of the circuit court would furnish ample authority for all of the employees and agents of the defendant city to comply therewith, notwithstanding any provisions to the contrary in the local ordinances.

We turn now to the substantive questions involved in this litigation. The ultimate question is, of course, whether plaintiff acquired vested rights to build the condominium in question. The subsidiary questions are the effect of the 90-day requirement for commencing construction under the building code and also the effect of the 90-day savings clause under the

zoning ordinance. The trial court filed a memorandum of decision in which it cited slightly over $24,000 of expenses excluding costs of the land itself, taxes paid, mortgage costs and the cost of the building permit among other things. Thereafter the trial court concluded that plaintiff had acquired vested rights because it had made a substantial change of position and that, although the plaintiff had "to some extent, proceeded casually," that they had proceeded in good faith. The memorandum makes no mention whatsoever of the 90-day requirements under either the building code or the zoning ordinance. The trial court decision can be explained in one of two ways: first, the trial court could have decided that the plaintiff had met both the requirements of the building code and of the zoning ordinance and that, in addition, it had met the common law test for acquisition of vested rights. Secondly, the trial court could have reached its decision by concluding that the plaintiff had met the common law test for vested rights and therefore the building code and zoning ordinance provisions would have no effect upon it.

■■ We will first examine the requirements of the building code of the City of Rockford. Succinctly stated, it requires first that the building or work authorized by the permit commence within 90 days after the permit is issued and, second, that the work not be suspended for any period of 90 days thereafter. If either requirement is not met a new permit must be issued before the work can go forward. The June 26, 1973, letter from the building official of the city notified the plaintiff that the building permit had lapsed because the first requirement was not met. We start from the general premise that building code provisions requiring that work start within a specified time are valid. (See generally 9 McQuillin, Municipal Corporations, § 26.219 (3d ed. 1964).) We also note that in this suit there has been no challenge to the requirement itself; the parties just argue over whether or not the requirement was met. The city takes the position that one should look at the building permit itself and it deals with the actual physical construction of the building. Therefore, it further argues that commencing the building or work authorized by the permit means commencing actual work upon the building site on the physical construction of the building. It points out that there is no requirement to have a building permit in order to obtain plans, other permits, financing or numerous other things that a person might do when thinking about constructing a building. The intervenors take the position that actual physical construction of the building and not site preparation is the test to be applied and further argue that even if the plaintiff did commence work within the meaning of the building code that it certainly suspended its construction activity for periods of longer than 90 days. Plaintiff takes the position that any sort of continuous work upon the overall project of building the condominium was sufficient to meet the requirement of

commencing work and also to meet the requirement of not suspending work for 90 days or more. It takes the position that no on-site construction need be visible so long as there was continuous work on the project.

The record shows that the only on-site activity that occurred during the 90-day period after the building permit was issued was that an existing structure was demolished, debris was removed, some grading was done and some trees were removed. The building official of the city testified that for the 13 years which he had been employed by the city the city had uniformly interpreted the requirement of the building code to mean that the requirement of commencing work was met when forms were set and concrete was actually poured for the foundations or footings. He further testified that no building permit was required before a person could grade or move dirt around upon his property. Testimony elicited from Wilmer Wolfson, one of the beneficiaries of the plaintiff trust, indicated that Wolfson was fully cognizant of the 90-day requirement under the building code and that requirement was why he applied for his first temporary building permit in December, prior to receiving the actual building permit in March. Mr. Wolfson further testified to his familiarity with the types of activities for which permits were required in the City of Rockford and indicated that he knew no permit was required to move dirt around. He further testified that although a permit was required to demolish a building, it was a separate permit and the contractor who did the demolition had acquired one before the building was demolished. He further testified that he did not believe that any permit was required to cut down trees unless perhaps one was in the business of cutting down trees.

■■■ Illinois courts have often said that the same rules which govern the construction of statutes should be used in construing municipal ordinances. (See, *e.g.*, *City of East St. Louis v. Union Electric Co.* (1967), 37 Ill. 2d 537, 229 N.E.2d 522, *cert. denied*, 390 U.S. 948, 19 L. Ed. 2d 1136, 88 S. Ct. 1034; *City of Chicago v. Witvoet* (1975), 30 Ill. App. 3d 386, 332 N.E.2d 767.) Insofar as statutes are concerned, it has also been often recognized that the interpretation placed upon a statute by the agency charged with its enforcement is a substantial factor to be considered in construing that statute (*Youakim v. Miller* (1976), 425 U.S. 231, 47 L. Ed. 2d 701, 96 S. Ct. 1399), even though such interpretation might not be binding upon the court (*National Transportation, Inc. v. Howlett* (1976), 37 Ill. App. 3d 249, 345 N.E.2d 767). The Supreme Court of Illinois has further stated:

> "A reasonable construction of an ambiguous statute by the governmental officers or departments charged with its enforcement, if contemporaneous, consistent, long-continued, and in concurrence with legislative acquiescence, creates a

presumption of correctness which is only slightly less persuasive than a judicial construction of the same act." (*People ex rel. Watson v. House of Vision* (1974), 59 Ill. 2d 508, 514-15, 322 N.E.2d 15, 19.)

We can see no reason why these rules should not be applied to the building code provision in question. The divergence of positions taken by the parties herein indicates the ambiguous nature of the requirement in question. There is further uncontradicted testimony that the city's interpretation has been consistent and in effect for at least 13 years. The testimony further supports the finding that one of the major beneficiaries of plaintiff trust was familiar with the administrative interpretation applied to the ordinance in question. Under these circumstances we believe that the ordinance in question should be interpreted to mean that construction in the nature of pouring the footings or foundation is what is meant by the code requirement of commencing the building or work authorized by the permit. In this regard we find plaintiff's activities before the expiration of the 90 days insufficient to meet the requirement.

We turn now to an examination of the requirements of the zoning savings clause and whether they were met in this particular case. The requirements of the savings clause are (1) that a building permit had been lawfully issued before the effective date of the new zoning ordinance; (2) that construction begin within 90 days of the effective date of that ordinance; and (3) that construction be diligently pursued to completion. There is no question in this case but that the first requirement was clearly met. The second requirement, of course, raises the same question as the similar provision of the building code. We note, however, that the zoning savings clause as applied to this case actually would have given plaintiff 90 days from its enactment or until August 15, 1973, to commence construction.

■■ Although the provision here in question is undoubtedly not the first such provision to be enacted in the State of Illinois (see *Brunhild Towers, Inc. v. Chaddick* (1971), 1 Ill. App. 3d 730, 274 N.E.2d 872), this is apparently the first case in Illinois involving the actual interpretation of what such a clause means and whether it may be applied in lieu of the common law doctrine of vested rights. The cases from other jurisdictions which have interpreted such provisions are collected in the annotation appearing at Annot., 49 A.L.R.3d 1150 (1973). The validity of such provisions has been uniformly upheld. (2 Rathkopf, The Law of Zoning and Planning, ch. 57, § 8 (3d ed. 1972); Annot., 49 A.L.R.3d 1150 (1973); *cf.* 8 McQuillin, Municipal Corporations § 25.157, at 462 (3d ed. 1976).) McQuillin also sets forth the method for determining the application of such zoning savings provisions as follows:

"In such a case, the factual issue to be resolved is whether the

holder of the permit has preserved his permit by meeting the construction timetable provided for in the ordinance." 8 McQuillin, Municipal Corporations § 25.157, at 462 (3d ed. 1976).

■■ We now come to the question of determining what constituted construction begun within 90 days of the effective date of the zoning ordinance. The parties, of course, take positions basically similar to those which they took in relation to the meaning of the requirement in the building code. We do not, however, have available here a longstanding construction of the ordinance by the administrative department in charge of enforcing it, as we did in connection with the building code. Our examination of the cases from other states indicates an extremely wide variance in terms of what the courts have accepted as constituting construction under the requirements of the ordinance there involved. (See generally the cases cited in Annot., 49 A.L.R.3d 1150, §§ 7(a), 7(b) (1973).) The most helpful case in Illinois which we have found dealing with the meaning of the term "construction" is *Kansas Quality Construction, Inc. v. Chiasson* (1969), 112 Ill. App. 2d 277, 250 N.E.2d 785. The court was dealing with the meaning of the term "construction" as it appeared in the Illinois Architectural Act and stated:

" 'Construction' at the very least, means getting off the ground by going either up or down, not just thinking about it * * *." (112 Ill. App. 2d 277, 282-83, 250 N.E.2d 785, 787.)

While it is undisputed in this case that plaintiff did more than just think about constructing a building, it is also undisputed that the building itself was never begun until some time in January 1975. It has often been said that in construing statutes courts will assume that the words have their ordinary and popularly understood meaning. See *e.g., General Motors Corp. v. Industrial Com.* (1975), 62 Ill. 2d 106, 338 N.E.2d 561.) We also note that it is important to consider not only the language of the enactment itself but also the objective sought to be obtained in enacting it. See, *e.g., People v. Dednam* (1973), 55 Ill. 2d 565, 304 N.E.2d 627; *National Transportation, Inc. v. Howlett.*

■■ With these principles in mind, we first note that the proposed condominium would be a nonconforming use under the existing zoning. The article of the zoning ordinance entitled "Nonconforming Uses and Structures" commences with a "Statement of Intent" in section 500. Although this section states that such uses may continue until removed, it further states that they should not be enlarged or expanded, and that the intent is not to encourage their survival, but rather that they should be terminated pursuant to the requirements of that article. The article thereafter includes a list of relatively short time periods in which such uses shall be deemed to have been abandoned or discontinued, after which

they may not lawfully be resumed. In addition, we find the following sentence not cited to us by either party but included in their exhibits, in section 500 of the zoning ordinance:

> "To avoid hardship, nothing in this Article shall be deemed to require a change in the plans, construction, or designated use of any building on which *actual* construction was lawfully begun prior to the effective date of adoption or amendment of this Ordinance and upon which *actual* building construction has been carried on diligently." (Emphasis added.)

We note the similarity of this provision to sections 401.3 and 501.4 previously referred to in this opinion. This particular sentence, however, emphasizes the requirement of actual construction or actual building construction. We note also that the city has an obvious interest in requiring that buildings be completed expeditiously in the interest of the public health and safety of the citizens. Further, we believe that the ordinary and accepted meaning of the words "construction" or "to construct" signifies actual activity in erecting or putting up a building. Although there are certainly other activities involved in construction projects, we note that there are words indicating what they are, such as surveying the property or making architectural drawings. We do not believe the city, in enacting the provisions here in question, had in mind plaintiff's idea that any work upon the general construction project would suffice. To the contrary, we find these provisions to mean that the city intended to allow people to complete projects which were actually started in terms of construction activity on the building itself within 90 days. If the city had intended some other activity to suffice we note that they could easily have chosen words other than "construction" and "actual construction" to indicate this intent. For these reasons we do not believe that plaintiff began construction within 90 days after the effective date of the new zoning ordinance.

■■■ We, therefore, come to the question of whether the savings clause provided in the zoning ordinance is a substitute for the common law doctrine of vested rights. We note first of all that in section 500, set forth above, the intention of the city is to avoid hardship. That, of course, is one of the reasons the vested rights doctrine was enunciated in the first place. That is why the doctrine, as normally stated, requires a substantial change made in good faith reliance upon a permit or the probability of issuance of a permit. In considering a savings clause enacted by the City of San Francisco, the Supreme Court of California had the following to say about the relationship of the vested rights doctrine and savings clauses:

> "Prior to the enactment of section 150, even a permit which had achieved administrative finality could be revoked on the basis of a

subsequent change in the zoning laws. The permittee could win immunity from such 'ex post facto' revocation only by constructing a substantial portion of the structure authorized by his permit in good faith reliance upon the prior law. A permittee who delayed construction in the face of an impending amendment to the zoning laws might find that he had not progressed far enough in time to qualify for immunity; one who proceeded with unseemly haste ran the risk that his conduct might bear the stigma of bad faith. No facile formula informed the permittee how to strike the delicate balance which would afford the desired immunity.

"To eliminate the uncertainty and waste inherent in these rules, a number of municipalities enacted ordinances which predicated immunity from permit revocation upon some clearly defined action of a municipal agency." (*Russian Hill Improvement Association v. Board of Permit Appeals* (1967), 66 Cal.2d 34, 39-40, 56 Cal. Rptr. 672, 676-77, 423 P.2d 824, 828-29.) (Footnotes omitted.)

Similarly we believe the City of Rockford, in enacting the provisions here in question, was attempting to avoid the pitfalls of the vested rights doctrine and give the persons affected a more objective standard by which they could measure whether they would obtain the desired immunity. In this case the city chose to measure that by whether or not the permittee actually began construction within the stated period. We further note that in this suit no challenge has been made as to whether or not that period was sufficiently long. Under the circumstances involved in this case, however, we are compelled to note that even had the permittee been given a year to start construction, the requirement would not have been met. We believe that this ordinance is the measure of whether or not the plaintiff acquired a vested right to complete its proposed project and we welcome the attempt of the municipality to inject a degree of certainty and objectivity where none has existed before. Since plaintiff did not comply with this provision, it acquired no vested right to complete the project.

■■ We do not wish to be understood in this opinion as intimating that the common law doctrine of vested rights is no longer viable in Illinois. Some municipalities may choose not to enact such savings provisions. Further, we note that Illinois is one of the few States which recognizes that actual expenses incurred before a permit is ever granted may provide the basis for a claim to vested rights. (See 2 Rathkopf, The Law of Zoning and Planning, ch. 57, § 4 (3d ed. (1973).) A provision such as the one here before us could, of course, have no effect on cases involving solely prepermit expenses.

As plaintiff has conceded in its brief, it bore the burden of proof to

establish that it had a clear legal right to the writ of mandamus. For the foregoing reasons, we hold that the plaintiff failed to establish such a clear right. The judgment of the trial court is therefore reversed.

Reversed.

SEIDENFELD, J., concurs.