**FLOYD AND CLARK COUNTIES, Indiana Building and Construction Trades Council, AFL–CIO, Plaintiffs,**

v.

**CUSTODIS–ECODYNE, INC., Defendant.**

**No. NA 85–338–C.**

United States District Court, S.D. Indiana, · New Albany Division.

Oct. 14, 1986.

Charles R. Isenberg, Thomas J. Schulz, Isenberg, Sales, Stewart & Cutler, Louisville, Ky., for plaintiffs.

Jack L. Whitacre, Mark P. Johnson, Spencer, Fane, Britt & Browne, Kansas City, Mo., Richard T. Mullineaux, Wyatt, Tarrant, Combs & Orbison, New Albany, Ind., for defendant.

ENTRY

BARKER, District Judge.

The matter now before the court is another in a long line of disputes that have arisen in connection with the ill-fated Marble Hill nuclear generating project begun by Public Service Indiana but abandoned in 1984, following numerous cost overruns and the resultant recommendation of the Governor's special task force.

In September of 1977, when the outlook for Marble Hill appeared much brighter, Public Service Indiana ("PSI"), various contractors and subcontractors, and the plaintiff, Floyd and Clark Counties, Indiana Building and Construction Trades Council, AFL–CIO ("plaintiff" or "Council"), entered into a "Project Agreement."

The Project Agreement set out the general parameters of the labor relations arrangement among PSI, the contractors and subcontractors, and the workers, regulating the terms and conditions of employment, rates of pay, employee fringe benefits, and dispute resolution. The Project Agreement also provides in part for a grievance and arbitration procedure to settle disputes. The scope of the Project Agreement "concerns the construction of the Marble Hill Nuclear Generating Station Units No. 1 and 2 (Project)." According to the agreement, "[i]t is understood that the owner, Public Service Indiana, may at its sole option terminate or suspend any or all work on the Project or any portion thereof, for a specified period by notice in writing to the Employer." Finally, the agreement states that it "shall remain in full force and effect for this Project until the completion of the construction of the Marble Hill Nuclear Generating Station, Units No. 1 and 2."

When construction on the Marble Hill Project began in 1977, PSI contracted with Ecodyne Cooling Products Division of the Ecodyne Corporation ("Ecodyne Cooling") to construct mechanical draft cooling towers at the Marble Hill Project. At this time, Ecodyne Cooling signed a letter of assent to become bound to the terms of the Project Agreement, such assent being required by the following language in the Project Agreement:

> The Owner and/or Employer agrees that when any work to be performed on the job site covered by this Agreement is contracted or subcontracted by the Owner and/or Employer that all contractors and/or subcontractors will be required to become signatory and comply with the terms and conditions of this Agreement.

Ecodyne Cooling, according to the business records of PSI, completed construction of the mechanical draft cooling towers in 1982. On December 30, 1983, the Board of Directors of PSI voted to suspend all construction at the Marble Hill Project. On that same day, PSI sent notice of the suspension to Ecodyne Cooling. On January 13, 1984, the Board of Directors voted to cancel the Marble Hill Project, and on February 28, 1984, PSI notified Ecodyne Cooling in writing of the cancellation. The Board of Directors made formal announcement of cancellation and abandonment of

the Marble Hill Project on November 14, 1984.

In the midst of these decisions and communications, Ecodyne Cooling underwent some corporate changes. On February 1, 1984, some, but not all, of the assets of the Ecodyne Cooling Products Division were purchased from the Ecodyne Corporation by a subsidiary of Research-Cottrell, Inc. Prior to this time, neither the Ecodyne Corporation nor its Ecodyne Cooling Products Division had any relationship with Research-Cottrell or any of its subsidiaries. The purchased assets of Ecodyne Cooling were then formed into a new corporation, Custodis-Ecodyne, Inc. ("Custodis-Ecodyne"), which became a subsidiary of Constructed Products Group, Inc., itself a subsidiary of Research-Cottrell. The aforementioned communications from PSI after this time relating to cancellation of the Marble Hill Project, which were addressed to Ecodyne Cooling, were received by Custodis-Ecodyne.

In July of 1985, PSI and Custodis-Ecodyne entered into an agreement pursuant to which Custodis-Ecodyne purchased certain portions of the internal structures of four of the seventy-two mechanical draft cooling towers at the Marble Hill Project. The sales agreement called for Custodis-Ecodyne to do the actual removal of the materials from the cooling towers. This removal of materials is known in the industry as "tearout" work.

Custodis-Ecodyne performed this tearout work over a two-month period in 1985, using a crew of sixteen nonunion employees. In performing this work, Custodis-Ecodyne did not observe the terms of the Project Agreement or any other collective bargaining agreement with a union. By letter dated August 22, 1985, attorneys for Laborers Local Union No. 795, a party to the Project Agreement and an affiliated member of the Council, lodged a grievance against Custodis-Ecodyne, alleging Custodis-Ecodyne had violated the Project Agreement by not applying the terms and conditions, rates of pay, employee fringe benefits, and referral procedures of Local Union

795. Custodis-Ecodyne has refused to submit to the grievance and arbitration procedures contained in the Project Agreement, contending that it is not bound by the agreement because it is not a labor relations successor to Ecodyne Cooling. The Council has filed the present action seeking a declaration that Custodis-Ecodyne is obligated to comply with the terms of the Project Agreement. Both parties have filed motions for summary judgment.

As a threshold matter, the court notes its jurisdiction of this matter pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Furthermore, whether Custodis-Ecodyne agreed to be bound by the contract in this case—specifically, whether it agreed to arbitrate—is a matter to be decided by the court, not an arbitrator. *AT & T Technologies, Inc. v. Communications Workers of America,* —— U.S. ——, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). *See also John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 547, 84 S.Ct. 909, 912, 11 L.Ed.2d 898 (1964).

The question for the court's resolution in this case is whether the Marble Hill Project Agreement was binding on Custodis-Ecodyne when it performed the tearout work in 1985. Neither Custodis-Ecodyne nor Research-Cottrell or any of its other subsidiaries was signatory to the 1977 Project Agreement, nor did any of them ever sign a letter of assent to the Project Agreement. Furthermore, the Council does not allege that Custodis-Ecodyne expressly assented in any other communication to the terms of the agreement. Therefore, Custodis-Ecodyne will only be bound if it is determined to be a "successor" to Ecodyne Cooling for labor relations purposes.

The guidelines set out by the Supreme Court for determining when one company is a successor to another company for labor relations purposes are not difficult to apply to the facts of this case. Despite the various twists and turns in the Supreme Court decisions, one principle clearly resounds: The most significant factor for determining whether a company

that has otherwise not so agreed succeeds to the labor relations obligations of a predecessor following merger or sale of assets is the composition of the resultant workforce. For example, in *John S. Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Court found the wholesale transfer of employees from one corporate entity to another following a merger to be the persuasive factor in holding the surviving corporation a labor relations successor with a duty to arbitrate under a collective bargaining agreement. *Id.* at 551, 84 S.Ct. at 915. The general inquiry, according to the Court, should focus on whether there is a "substantial continuity of identity in the business enterprise before and after [the] change." *Id.* In *Wiley*, the Court determined that this continuity was evidenced by the transfer of virtually all the employees.

In contrast, the Court in *Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), later determined that Howard Johnson's purchase of most of the assets of a restaurant and motor lodge did not render Howard Johnson a successor to the labor relations obligations of its predecessor. This determination was based primarily on the fact that, of the forty-five employees Howard Johnson hired, only nine were from the seller's contingent of fifty-three employees. *Id.* at 263, 94 S.Ct. at 2243. In reaching this decision, the Court noted the emphasis lower courts had placed on the continuity of the workforce, finding this interpretation of *Wiley* to be consistent with the Court's desire to balance the goal of affording protection to employees retained in " '[t]he transition from one corporate organization to another' from sudden changes in the terms and conditions of their employment" with the "new employer's right to operate the enterprise with his own independent labor force." *Id.* at 264, 94 S.Ct. at 2244 (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960)).

*See also id.* at 264 n. 10, 84 S.Ct. at 917 n. 10.

■ The case now before the court closely resembles *Howard Johnson* on the issue of continuity of workforce. When Custodis-Ecodyne purchased most of the assets of Ecodyne Cooling, it retained only three of the latter's approximately fifty employees. For this reason alone, the plaintiff has failed to demonstrate that Custodis-Ecodyne is a labor relations successor bound to arbitrate according to the terms of an agreement signed by Ecodyne Cooling.

The conclusion that Custodis-Ecodyne is not bound to the labor relations obligations of Ecodyne Cooling is further buttressed by other indications that "substantial continuity of identity" between the two entities is lacking. According to the unrefuted evidence adduced by the defendant, the two companies differ significantly in operation. Ecodyne Cooling did both construction and maintenance work, principally on draft cooling towers such as those constructed at Marble Hill between 1977 and 1982. Custodis-Ecodyne, on the other hand, is almost solely a maintenance contractor, performing work on a broader range of structures.

■ The plaintiff Council has not vigorously resisted the conclusion, based on the holdings of the Supreme Court as well as numerous lower federal courts, that Custodis-Ecodyne is not a labor relations successor to Ecodyne Cooling. The Council maintains, however, that the situation here is somehow different from the normal "successorship" case because it does not relate to a bilateral collective bargaining agreement negotiated between one company and one union. Rather, the Project Agreement purports to cover all construction work by all companies at the Marble Hill site. Therefore, the Council contends, Custodis-Ecodyne assented to being bound by the terms of the Project Agreement merely by virtue of its performing work at the Marble Hill site. This argument, however, lacks merit for a number of reasons.

First, the language of the Project Agreement does not indicate that performance of

work at the Marble Hill site equals some passive assent to the terms of the agreement. Rather, the agreement very explicitly states that all contractors performing work covered by the agreement *"will be required to become signatory* and comply with the terms and conditions of this agreement." (Emphasis added.) In other words, the Project Agreement did not contemplate automatic assent upon a contractor's performing work but required affirmative assent to the Project Agreement. This unambiguous meaning is demonstrated by the fact that Ecodyne Cooling (along with the other contractors and subcontractors at Marble Hill) affirmatively signed letters of assent to be bound by the agreement. Furthermore, the Project Agreement clearly places on the *"Owner"* (*PSI*) the duty of requiring all contractors to become signatory to the agreement; it does not make this the obligation of the employer contractor. The only obligation assumed by employers or contractors in this regard is to require their subcontractors to become signatory to the agreement, an obligation not at issue in this case. Therefore, any breach of the obligation to make contractors signatory to the agreement was committed by PSI, not Custodis-Ecodyne, and PSI has not been made a defendant in this action.

Second, the work performed by Custodis-Ecodyne at the Marble Hill site does not fall within the scope of the Project Agreement because it did not constitute "construction" as that term is commonly used and understood. The Project Agreement, according to its terms, "concerns the construction" of Marble Hill and is to apply "during the existence of the Construction Project." In other words, it does not cover all work performed at the site, but expressly covers only construction work.

As previously noted, the work performed by Custodis-Ecodyne is called "tearout" work in the industry. It amounted to removing parts that were reusable from the inside of the cooling towers. After PSI abandoned the Marble Hill Project in 1984, it obviously had an interest in salvaging as much equipment and inventory as possible

from the site in order to recoup at least a portion of its massive losses. When PSI sold these parts to Custodis-Ecodyne, the contract, quite understandably, required Custodis-Ecodyne to remove the parts it had purchased. This activity hardly comports with a reasonable interpretation of the term "construction."

The term "construction" has been judicially and legislatively defined in a number of contexts. "Construction," as defined by *Black's Law Dictionary* (rev. 4th ed.) and applied by a federal court in an interpretation of the Clean Air Act, means "the creation of something new, as distinguished from the repair or improvement of something already existing." *United States v. Narragansett Improvement Co.*, 571 F.Supp. 688 (D.R.I.1983). Several state courts have construed the term. In *White v. Cabot Corp.*, 194 So.2d 499 (Miss.1967), the term "construct" as used in a mechanics' lien statute was found to comprehend "more than simply disassembling, transporting, [and] unloading.... It connotes the building, composing, fabricating, or erecting of a piece of property or structure somewhat permanent in nature. *Id.* at 501 (citing authority). In interpreting a zoning ordinance, an Illinois court stated the ordinary and accepted meaning of "construction" to be "actual activity in erecting or putting up" a structure. *First National Bank & Trust v. City of Rockford*, 47 Ill.App.3d 131, 5 Ill.Dec. 509, 361 N.E.2d 832 (1977). Finally, in *Muirhead v. Pilot Properties, Inc.*, 258 So.2d 232 (Miss.1972), the court simply indicated that "construction" means "to build or to erect something which theretofore did not exist." *Id.* at 233.

The removal of salvageable parts from the inside of the cooling towers represents, in a practical sense, the opposite of construction work. Removal of the parts was not done to facilitate eventual completion of the structures; it was a dismantling directed towards achieving a wholly different objective. For this reason, the tearout work performed by Custodis-Ecodyne was

not within the scope of the Project Agreement.[1]

Finally, and perhaps most importantly, the Project Agreement does not apply to the work performed by Custodis-Ecodyne because the Project Agreement, according to its own language, is no longer in effect. This conclusion is compelled by a reading of pertinent parts of the agreement considered along with the actions of PSI with regard to the cancellation of the Marble Hill Project.

The following parts of the Project Agreement speak to the duration of the agreement. The first paragraph of the Project Agreement defines the Project as "the construction of the Marble Hill Nuclear Generating Station Units No. 1 and 2." Paragraph 1 of Article I ("Scope of the Agreement") states, "This agreement represents the complete understanding of the parties and the Employer shall not be required to sign any other agreement with other Unions *during the existence of the Construction Project.*" (Emphasis added.) PSI also reserved the right to suspend or terminate work on the project. "It is understood that the Owner, Public Service Indiana, may at its sole option terminate or suspend any or all work on the Project or any portion thereof, for a specified period by notice in writing to the Employer."

The actions of PSI with regard to the Marble Hill Project demonstrate that the Project Agreement is no longer effective because the project itself is no longer in existence. PSI initially suspended and later terminated work on Marble Hill with written notice to the contractors, as it had the right to do under the Project Agreement. Most importantly, in 1984, PSI *cancelled and abandoned* the Marble Hill Project. The language of the agreement gives the Project Agreement no life independent of the project itself; it would, therefore, be wholly unreasonable and beyond the obvious contemplation of the parties to hold the Project Agreement viable long after the death of the only project the agreement purports to govern.

The Council seizes upon language at the end of the Project Agreement which states that the agreement "shall remain in full force and effect for this Project until the completion of the construction of the Marble Hill Nuclear Generating Station, Units No. 1 and 2." The plaintiff argues that because construction was never completed, and because, given the massive investment already made at Marble Hill, PSI may someday decide to complete construction at Marble Hill, the agreement remains in full force and effect. Although the court cannot say with absolute certainty that this contingency is beyond the realm of possibility, such a contingency does not serve to revitalize an otherwise defunct project. The language quoted by the plaintiff states that the agreement remains in full force and effect *"for this Project."* Because the project has been cancelled and abandoned, the agreement is no longer in effect. If PSI does in the future decide to do further work at the Marble Hill site, it will be pursuant to a *new* project, because the PSI Board of Directors voted on January 13, 1984, to *cancel* the project, not to suspend or postpone it.

*Conclusion*

For a number of reasons, then, Custodis-Ecodyne was not bound to the 1977 Project Agreement when it performed tearout work at the Marble Hill site in 1985. First, Custodis-Ecodyne was not signatory to the agreement and, lacking substantial identity to the predecessor signatory, Ecodyne Cooling, did not become a successor to the labor relations obligations of Ecodyne Cooling. Second, the terms of the agreement do not make the performance of work at the Marble Hill site an automatic assent to

---

1. The Council argues in its brief that interpretation of the terms contained in the Project Agreement is a task for the arbitrator, not the court. If these parties were otherwise bound to arbitration, this position would at least be arguable. *See AT & T Technologies, Inc. v. Communica-* *tions Workers of America,* — U.S. —, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Because the court has already found that Custodis-Ecodyne has no duty to arbitrate, this construance of the contract merely provides additional support for the court's prior conclusion.

the agreement, assuming that such assent could ever be possible under general contract principles and federal labor law. Third, removal of parts from a structure for the purpose of sale or re-use cannot be characterized as "construction," so as to fall within the scope of the Project Agreement. Finally, the Project Agreement expired by its own terms with the cancellation of the Marble Hill Project. There being no genuine issue of any fact material to the obligations of Custodis-Ecodyne under the Project Agreement, the court now GRANTS the summary judgment motion of Custodis-Ecodyne and DENIES the summary judgment motion of the Council.